**CASE NO. 21-1827**

## IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

_____

DIJON SHARPE,

*Plaintiff – Appellant,*

v.

WINTERVILLE POLICE DEPARTMENT, Officer WILLIAM BLAKE
ELLIS, in his official capacity only, and Officer MYERS PARKER
HELMS IV, in his individual and official capacity,

*Defendants – Appellees.*

_____

FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

_____

## **RESPONSE BRIEF OF APPELLEES**

_____

Dan M. Hartzog, Jr.
Katherine M. Barber-Jones
HARTZOG LAW GROUP LLP
2626 Glenwood Avenue, Suite 305
Raleigh, North Carolina 27608
(919) 670-0338
dhartzogjr@hartzoglawgroup.com
kbarber-jones@hartzoglawgroup.com
*Counsel for Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>21-1827</u>      Caption: <u>Dijon Sharpe v. Winterville Police Department et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Myers Parker Helms IV, in his official and individual capacities</u>
(name of party/amicus)

_____

who is _____<u>Appellee</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                        ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                         ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?         ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Katherine M. Barber-Jones                Date: 01/18/2022

Counsel for: Defendants-Appellees

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. <u>21-1827</u>          Caption: <u>Dijon Sharpe v. Winterville Police Department et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>William Blake Ellis, in his official capacity only</u>
(name of party/amicus)

_____

 who is _____<u>Appellee</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?                                ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                    ☐ YES ☑ NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Katherine M. Barber-Jones          Date: 01/18/2022

Counsel for: Defendants-Appellees

Print to PDF for Filing

TABLE OF CONTENTS

TABLE OF CONTENTS ...............................................................i

TABLE OF AUTHORITIES ....................................................ii

STATEMENT OF THE ISSUES................................................ 1

STATEMENT OF THE CASE .................................................. 2

    I.    Background Facts ........................................................ 2

    II.    Procedural History...................................................... 7

SUMMARY OF THE ARGUMENT ......................................... 10

ARGUMENT ........................................................................ 13

    I.    The District Court properly granted the individual-capacity Defendants' Motion to Dismiss on the basis that qualified immunity barred Plaintiff's claims....................... 17

        A.  Plaintiff did not have a clearly established right to livestream on social media while he was seized during a traffic stop. ................................................. 19

        B.  Officer Helms did not violate Plaintiff's First Amendment rights. ...................................................... 25

        C.  Plaintiff's First Amendment retaliation claims were properly dismissed. ............................................. 46

    II.    The District Court properly granted the official-capacity Defendants' Motion for Judgment on the Pleadings on the basis that the Town of Winterville had not adopted an unconstitutional policy.......................................................... 50

CONCLUSION ..................................................................... 56

CERTIFICATE OF COMPLIANCE ...................................... 58

CERTIFICATE OF SERVICE................................................ 59

## TABLE OF AUTHORITIES

**Cases**

*ACLU of Tenn., Inc. v. City of Memphis*, Case No. 2:17-cv-02120-JPM, 2020 WL 4819544 (Aug. 19, 2020)........................................35

*ACLU v. Wicomico County, Md.,* 999 F.2d 780 (4th Cir.1993) ...............47

*Am. Mfrs. Mut Ins. Co. v. Sullivan*, 526 U.S. 40 (1999) .........................53

*Amer. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ...........................................................................................28, 29

*Anderson v. Creighton*, 483 U.S. 635 (1987).........................................24

*Arizona v. Johnson*, 555 U.S. 323 (2009)...............................24, 34, 41, 43

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................52

*Bradley v. Ramsey*, 329 F. Supp. 2d 617 (W.D.N.C. 2004) ....................51

*Brendlin v. California,* 551 U.S. 249 (2007)......................................21, 40

*California v. Rooney*, 483 U.S. 307 (1987)..............................................17

*Canton v. Harris*, 489 U.S. 378 (1989)...................................................54

*Carter v. Morris*, 164 F.3d 215 (4th Cir. 1999).......................................54

*City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500 (2019) ....................19

*Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387 (D.C. Cir. 1990) ...................................................................................................45

*Durham v. Horner,* 690 F.3d 183 (4th Cir. 2012)....................................18

*Dyer v. Smith*, No. 3:19-CV-921, 2021 WL 694811 (E.D. Va. Feb. 23, 2021) ...................................................................................................22

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999) .................51

*F.C.C. v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775 (1978) ............31

*Fields v. City of Philadelphia*, 862 F.3d 353 (3d Cir. 2017).............. 28, 34

*First Nat'l Bank v. Bellotti*, 435 U.S. 765 (1978) ...................................26

*Frisby v. Schultz*, 487 U.S. 474 (1988)...................................................45

*Gericke v. Begin*, 753 F.3d 1 (1st Cir. 2014) ................................... 26, 28

*Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011)............................. 26, 27, 28

*Graham v. Connor*, 490 U.S. 386 (1989)................................................48

*Green v. City of Raleigh*, 523 F.3d 293 (4th Cir. 2008) ...........................44

*Henry v. Purnell,* 652 F.3d 524 (4th Cir. 2011) ......................................18

*Hope v. Pelzer*, 536 U.S. 730 (2002) ......................................................24

*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978)...........................................26

*Huang v. Bd. of Governors,* 902 F.2d 1134 (4th Cir. 1990)....................47

*Hulbert v. Pope*, No. SAG-18-00461, 2021 WL 1599219 (D. Md. 2021) 22, 23

*Jefferson v. Sch. Bd. of City of Norfolk*, 452 F. App'x 356 (4th Cir. 2011) .................................................................................................52

*Kentucky v. Graham*, 473 U.S. 159 (1985) .............................................51

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018)..........................................19, 20

*Lytle v. Doyle*, 326 F.3d 463 (4th Cir. 2003) ..........................................54

*Maryland v. Wilson*, 519 U.S. 408 (1997)..............................22, 34, 41, 43

*Merchant v. Bauer,* 677 F.3d 656 (4th Cir. 2012).....................................18

*Michigan v. Long*, 463 U.S. 1032 (1997)......................................34, 41, 43

*Michigan v. Summers*, 452 U.S. 692 (1981) ...........................................34

*Mills v. Alabama*, 384 U.S. 214 (1966) ....................................................26

*Moore v. City of Creedmoor*, 345 N.C. 356, 481 S.E.2d. 14 (1997)..........51

*Nieves v. Bartlett*, 139 S. Ct. 1715 (2019) .........................................48, 49

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) .........................45

*Project Veritas Action Fund v. Rollins*, 982 F.3d 813 (1st Cir. 2020) ....29

*Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969).......................31

*Rodriguez v. United States*, 575 U.S. 348 (2015) .............................34, 43

*Ross v. Early*, 746 F.3d 546 (4th Cir. 2014)................................43, 45, 55

*Saucier v. Katz,* 533 U.S. 194 (2001) .......................................................18

*Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000)...................28

*Stanley v. Georgia*, 394 U.S. 557 (1969) .................................................26

*Suarez Corp. Indus. v. McGraw*, 202 F.3d 676 (4th Cir. 2000) .............47

*Szymecki v. Houck*, 353 F. App'x 852 (4th Cir. 2009) ............................19

*Tobey v. Jones*, 706 F.3d 379 (4th Cir. 2013)..........................................18

*Turner v. Lieutenant Driver*, 848 F.3d 678 (5th Cir. 2017) .............26, 28

*United States v. Barge Shamrock*, 635 F.2d 1108 (4th Cir. 1980) .........17

*United States v. Hensley,* 469 U.S. 221 (1985) .......................................50

*United States v. Jones,* 27 F. App'x 198 (4th Cir. 2001) .................. 34, 42

*United States v. Leshuk,* 65 F.3d 1005 (1995) ......................................... 50

*United States v. Moore,* 817 F.2d 1105 (4th Cir. 1987) .................... 34, 42

*United States v. O'Brien*, 391 U.S. 367 (1968) ...................................... 43

*United States v. Stanfield*, 109 F.3d 976 (4th Cir. 1997) ................ 43, 55

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ........................ 30, 43

*White v. Pauly*, 137 S. Ct. 548 (2017) ............................................... 19, 20

*Williams v. Ozmint,* 716 F.3d 801 (4th Cir. 2013) ................................. 18

*Wilson v. Layne,* 141 F.3d 111 (4th Cir. 1998) ...................................... 20

## Other Authorities

"Gangs embrace social media with deadly results," Associated Press (June 11, 2018) ................................................................... 35

"How emoji can kill: As gangs move online, social media can fuel violence," The Washington Post (June 13, 2018) ................................ 35

BBC News, "Christchurch shootings: 49 dead in New Zealand mosque attacks" (Mar. 15, 2019) ....................................................... 36

Cade Metz and Adam Satariano, "Facebook Restricts Live Streaming After New Zealand Shooting," The New York Times (May 14, 2019) 37

Emma Tucker and Priya Krishnakumar, "Intentional killings of law enforcement officers reach 20-year high, FBI says," CNN (Jan. 13, 2022) .................................................................................. 38

Tim Stelloh, "Minnesota man killed by police after apparently live streaming chase," NBC News (Sept. 9, 2019) ................................ 37, 38

Xander Landen, "Man Sets Up Facebook Livestream Before Attacking
    Florida Police Officers with Brick," Newsweek (Sept. 25, 2021) ........37

**Rules**

Fed. R. Civ. P. 12(b)(6) (2021) ...........................................................51, 52

Fed. R. Civ. P. 12(c) (2021) ...................................................................51

<u>STATEMENT OF THE ISSUES</u>

I.  Did the District Court properly dismiss Plaintiff's individual-capacity claims against Officer Helms?

II. Did the District Court properly grant judgment on the pleadings for the official-capacity Defendants?

<u>STATEMENT OF THE CASE</u>

**I.    Background Facts**

On October 9, 2018, Plaintiff-Appellant Dijon Sharpe (*hereinafter*, "Plaintiff" or "Sharpe") was a passenger in a vehicle that was pulled over by Officer Ellis and Officer Helms of the Town of Winterville Police Department (*hereinafter*, "WPD"). (JA8-9). While waiting for the officers to approach, the driver, Juan'kesta Staton ("Staton") called someone on his mobile phone, informing the person that he had been pulled over by police while following the directions she recommended. (JA8; Recording, 1:37-2:47).[1] At the same time, Plaintiff began livestreaming – broadcasting in real time – via Facebook Live to his Facebook account. (JA9).

The initial interaction between the officers, Staton, and Plaintiff lasted about a minute and a half. (Recording, 00:00-1:33). Officer Helms remained at the vehicle, next to Plaintiff, while Ellis returned to the patrol car. (*Id.*) During the interaction, Plaintiff argued with Officer

---

[1] Plaintiff's Facebook Live broadcast of this incident is available at https://www.facebook.com/d.r.sharpe/videos/2251012878304654/. While Plaintiff supplied a transcript with the Complaint (*see* JA15-JA39), viewing the Facebook Live broadcast furnishes additional information and context and is cited herein as "Recording."

Helms regarding whether Staton had run a stop sign. (Recording, 3:21-3:53). Plaintiff asked if they could walk down the street to view the stop sign "right now," and Officer Helms said "No." (Recording, 3:44-3:48). Plaintiff then refused to provide his name when asked. (JA9; Recording, 4:44-4:52).

While Plaintiff and Staton waited for officers to return, Plaintiff's Facebook friends were commenting, some on the police in general, and others asking what they were doing:

> Naj Wraith-Sharp (2:33) What y'all doing
>
> Naj Wraith-Sharp (2:48) Wtf!!!
>
> Jamar Jackson (3:06) They don't like you Dijon [Sharpe responded later: They're gone respect me tho]
>
> Taye Gibbs (4:05) Smh
>
> Justin Staton (5:01) 😭😭😭😭😭
>
> Naj Wraith-Sharp (6:34) Keep your live on
>
> Naj Wraith-Sharp (6:46) It keep pausing
>
> Naj Wraith-Sharp (7:16) Where y'all at?

*See* Comments, "Newest," at https://www.facebook.com/d.r.sharpe/videos/2251012878304654/.

The officers returned to the patrol vehicle to run the driver's license and issue a citation. (JA9). Upon returning to the vehicle where Staton

and Sharpe were stopped, Officer Helms saw and confirmed that Plaintiff was live broadcasting over Facebook Live. (JA9).

He asked, "What've we got, Facebook Live, cous'? We ain't gonna do Facebook Live, because that's an officer safety issue." (JA9; Recording 11:38-11:43). Officer Helms then reached into the vehicle toward Plaintiff's phone. (JA9; Recording at 11:40-11:44). The video shows Plaintiff refusing to give up his phone and leaning into the vehicle, at which point Officer Helms grabbed and quickly released Plaintiff's seatbelt. (JA9; Recording, 11:45-11:48).

At this point, Sharpe began yelling, "Man, get off my phone. Man, look at your boy, look at your boy," either to Staton, his Facebook audience, or both. (Recording 11:48-11:57). Staton chimed in, "Why you grabbin' on him, though, man? 'Cause he got his phone on? You can't be grabbin' on him, dog." (Recording, 11:52-11:57). Meanwhile, Officer Ellis, who was at the driver's side, was trying to explain Staton's three citations to him and clarify the policy regarding livestreaming to both Staton and Sharpe. (*See* Recording, 11:53-12:15). Simultaneously, Sharpe was occupied addressing his Facebook Live audience: "Your man's just grabbed me, you seen him grab my phone, my seatbelt, grab on me and

4

everything? P. Helms!" (Recording 12:30-12:34). Officer Ellis tried to get Sharpe's attention, and says, "Hey, I'm talking to you… I'm talking to you." (Recording 12:34-12:37). Staton tried to cover for Sharpe, saying "Hey, he's talking to the other dude." (Recording 12:36). Sharpe recalled his attention to the vehicle and repeated what Staton said, "I'm talking to him, okay." (Recording, 12:36-12:37).[2] That Sharpe is addressing his Facebook Live audience is supported by their comments throughout the encounter, *inter alia*:

> Naj Wraith-Sharp (12:14) Did he just grab your phone!???
>
> Caltisha Carmack (12:19) Wow he really was grabbing
>
> Naj Wraith-Sharp (12:39) Dijon hush
>
> Naj Wraith-Sharp (12:59) Handle it once it's off

Officer Ellis, who was at the driver's side, likewise stated that they could not allow Facebook Live:

> Facebook Live? We're not gonna have it, okay, because that lets everybody y'all following on Facebook know that we're out here. There might be just one of me next time, okay? It lets everybody know where y'all are at. We're not gonna have that…. If you were recording, that is just fine. We record, too.

---

[2] It is plain from the pronouns used by Sharpe during his exclamations that he was not addressing Officer Helms when he said "…you seen him grab my phone…." (Recording, 12:30-12:33).

(Recording, 12:39-12:57). Officer Ellis explained during the encounter that their concerns regarding Facebook Live were based upon the fact that it lets anyone watching know where the traffic stop is being conducted. (*Id.*) He stated that recording was not a problem, but livestreaming was not allowed, and that Plaintiff would be arrested if he tried to livestream in the future. (JA10).

Plaintiff contends that he became a civic activist who promotes greater accountability for law enforcement following a 2017 traffic stop by another North Carolina police department in which he contends he was tased, choked, and beaten by the responding officers. (JA8). Staton explained their history to Officer Ellis, saying "Hey look, man, not y'all, but before, we had some shit going on in Greenville, police, man…" (Recording, 12:16-12:22). He explained further that, "…the last situation we had, the officer…beat a guy up…that didn't have his body cam on. Like I said, after that happened, man, I don't trust no cops." (Recording 13:03-13:10).

Officer Ellis sympathized, and said, "I understand that. If I had that happen to me, I'd probably be in the same situation. But to let you know, you can record on your phone [Staton, interjecting: "and you got to, for a

precaution"], but Facebook Live is not gonna happen." (Recording, 13:11-13:19).

## II.    Procedural History

Plaintiff filed this action in the United States District Court for the Eastern District of North Carolina (*hereinafter*, the "District Court"), asserting the following claims: 1) Declaratory Judgment for violation of 42 U.S.C. § 1983 against the officers in their official capacities and the Winterville Police Department; and 2) Violation of 42 U.S.C. § 1983 against Officer Helms for the "physical attack" against Plaintiff in trying to seize his cell phone, "including grabbing [Plaintiff's] seatbelt and shirt." (JA10-12).

Plaintiff's Complaint also alleged that the Town of Winterville Police Department had "an unconstitutional policy, custom, or practice of preventing citizens from recording and livestreaming their interactions with police officers in the public performance of their duties." (JA10). Plaintiff sought declarations that (a) he has a First Amendment-protected right to record police during the public performance of their duties and (b) his right to record police also includes the right to broadcast such recordings in real-time, regardless of whether or not any

other individuals view such a broadcast." (JA10). Plaintiff acknowledged in briefing that Plaintiff did not bring a claim for violation of his Fourth Amendment rights against Defendants and instead intended only to assert a claim under the First Amendment. (Pl.'s Resp. in Opp. to Partial Mot. to Dismiss, DE 19 at 6-7).

On February 3, 2020, Defendants timely filed an Answer and Partial Motion to Dismiss, seeking to dismiss the individual capacity claims against Officer Helms for failure to state a claim.  (JA50-51). On August 14, 2020, a hearing was held before the District Court, and, on August 20, 2020, an Order was entered dismissing Plaintiff's individual capacity claims. (JA54-70)

On November 18, 2020, the remaining official-capacity Defendants moved for judgment on the pleadings on the basis that: (1) Plaintiff failed to allege a policy, custom, or practice of the Town of Winterville sufficient to establish Monell liability; and (2) the policy alleged by Plaintiff, if it existed, would not be unconstitutional. (JA71-73). The District Court dismissed Plaintiffs' claims against the official-capacity Defendants, which had remained after the District Court's earlier grant of

Defendants' Partial Motion to Dismiss. (JA52-53). Plaintiff appealed

from the District Court's order on July 27, 2021.

## SUMMARY OF THE ARGUMENT

This case is about whether the Plaintiff has an absolute right to livestream a traffic encounter, in which he is a passenger in a lawful traffic stop. Plaintiff livestreamed the stop on Facebook Live and was told he could not livestream, although he could record. Plaintiff contends that the Town of Winterville has a policy prohibiting livestreaming during traffic stops and that Officer Helms' acts to enforce the policy violated Plaintiff's constitutional rights.

First, Plaintiff's claims against Officer Helms, for reaching for Plaintiff's phone and touching Plaintiff's shirt and seatbelt after Plaintiff disclosed that he was using Facebook Live to broadcast the stop, were properly dismissed based on qualified immunity. The Fourth Circuit has never issued a published opinion stating that an individual's right under the First Amendment to record a traffic stop is clearly established, much less held that an individual has a right to record and real-time broadcast a traffic stop from within the stopped car. Among circuits that have decided that the First Amendment protects the right to record police, none of the opinions involved recording by a passenger during a lawful traffic stop, nor did any of the opinions involve livestreaming,

geolocation, or internet messaging regarding police officers during a traffic stop. Even if other circuits have reached a "consensus" on the argued right to record police, such holdings would not apply to Plaintiff's actions in this case.

Second, the alleged policy prohibiting livestreaming by passengers during traffic stops would be content-neutral and subject to reasonable time, place, and manner restrictions. Such a policy would survive review under the intermediate scrutiny standard because it is narrowly tailored for the purpose and leaves open ample channels of communication. Additionally, it is not established that an officer's actions during a traffic stop be the subject of a First Amendment retaliation claim if they were reasonably justified under Fourth Amendment holdings on *Terry* stops and the stop itself was lawful. That officers may impose de minimis restrictions on passenger liberties during a traffic stop is well established.

Finally, Plaintiff's official-capacity claims were properly dismissed upon Defendants' motion for judgment on the pleadings. As discussed above, Defendants submit that the Town did not have a policy that caused a violation of Plaintiff's constitutional rights on October 9, 2018.

11

Additionally, Plaintiff also did not sufficiently allege underlying facts imputing *Monell* liability to the Town of Winterville, even when viewed in the light most favorable to Plaintiff.

As the District Court held below, such a right has never been recognized by any Circuit as a constitutional right, unencumbered by concerns of officer safety and maintaining order during a traffic stop. As such, the District Court properly held that Officer Helms was entitled to qualified immunity, and that the alleged policy would not violate the First Amendment. In asking this Court to reverse the District Court's decision, Plaintiff asks this Court to simply ignore the fundamental distinction between recording and livestreaming police officers. This Court should decline to ignore very real safety concerns that arise from livestreaming police encounters and affirm the District Court's orders and judgment for Defendants.

ARGUMENT

Plaintiff does not and should not have a clearly established First Amendment right to livestream during a lawful traffic stop as a detained passenger. Plaintiff and *amici* argue extensively that Plaintiff had the right to record police in public, while disregarding that the First Amendment activities at issue in Plaintiff's arguments cannot be sufficiently described as "recording" or "not recording" a traffic stop. (*See* JA63). The activity potentially falls within "five, distinct factual scenarios: (1) recording; (2) recording and real-time broadcasting; (3) recording and real-time broadcasting with geo-location information; (4) recording and real-time broadcasting with the ability to interact via messaging applications in real-time with those watching; and (5) recording and real-time broadcasting with geolocation information and the ability to interact via messaging applications in real-time with those watching." (JA63).

As determined by the District Court, Plaintiff's activities involved recording and real-time broadcasting with the ability to interact via messaging applications in real-time with those watching, with indeterminate ability to broadcast geolocation information. (*Id.*) That

constitutes far more activity than merely "recording" a traffic stop. Livestreams add additional hazards that are not presented by recording, in that they allow anyone watching to know where an officer is and what he or she is doing in real time, a situation which could dramatically increase the danger of a traffic stop. Indeed, livestreaming could easily turn a routine traffic stop into a crowd-control operation, leaving the officer in an unsafe position.

Even when the complaint is read in the light most favorable to Plaintiff, the alleged Town of Winterville anti-livestreaming policy and Officer Ellis' brief attempt to grab at Plaintiff's phone to stop him from livestreaming did not deprive Plaintiff of the ability to record the officers. In fact, Plaintiff was even allowed to continue livestreaming on this occasion. Plaintiff and *amici*'s extensive arguments concerning the right to record also disregard the fact that Officer Ellis literally said to Plaintiff ""If you were recording, that is just fine… We record, too." (JA34). The issue of whether a right to record exists is simply not the issue before this Court. Even so, it should be noted that only half the Circuit Courts in the United States have adopted a "right to record," with much disagreement regarding whether the right is clearly established.

Most recently, the U.S. Court of Appeals for the Tenth Circuit considered the issue in *Frazier v. Evans*, 992 F.3d 1003 (10th Cir. 2021), held that the officer-defendants had qualified immunity because the right to record was not established at the time of events leading to an First Amendment retaliation claim for allegedly deleting a bystander recording of them, but declined to decide whether the plaintiff actually had a First Amendment right to record the policy performing their official duties in public spaces. 992 F.3d at 1019-1020, n.4.

Moreover, Plaintiff has failed to squarely grapple with the complexities inherent in the intersection of First and Fourth Amendment concerns when traffic stops are at issue.[3] It is broadly acknowledged that passengers in a traffic stop are seized and may be subject to *de minimis* intrusions on their liberties, where the intrusion is reasonably justified for the officer to accomplish the purpose of the stop or for the safety of the officer, vehicle occupants, or others in the vicinity. Allowing these intrusions for officer safety and investigative purposes are already well-

---

[3] Plaintiff has repeatedly represented that he does not allege any Fourth Amendment violations in this case. (JA56).

15

established as substantial government interests in Fourth Amendment jurisprudence.

Even among the decisions from other circuits that Plaintiff urges this Court to adopt, the "right to record" is subject to reasonable time, place, and manner restrictions. Under such a standard, alleged policy prohibiting livestreaming by a detained vehicle occupant for the duration of a traffic stop and Officer Helms' alleged acts attempting to enforce it met were constitutional. The alleged policy and its application in Plaintiff's case met the standards for reasonable time, place, and manner restrictions tailored to serve a substantial government interest. Accordingly, none of the Defendants violated Plaintiff's First Amendment rights, and the District Court's order and judgment should be affirmed.

Plaintiff's arguments also distort the scope of the issues Plaintiff argued to the District Court and now brings to this Court for review. Plaintiff did not allege or argue below that the alleged policy was overbroad or an impermissible content-based restriction on speech. In the absence of plain error resulting in the denial of fundamental justice, the Fourth Circuit generally does not consider issues not previously raised.

*See United States v. Barge Shamrock*, 635 F.2d 1108, 1111 (4th Cir. 1980). These arguments should be considered waived on appeal.

Finally, even if Officer Helms was held to have violated Plaintiff's First Amendment rights, which is denied, Plaintiff did not allege sufficient facts to impute *Monell* liability to the Town of Winterville for such a violation. The District Court did not reach this issue, because it assumed that the alleged policy existed and held that the alleged policy was constitutional. Nevertheless, it is well established that this Court may affirm a dismissal on any ground supported by the record. *See, e.g.*, *California v. Rooney*, 483 U.S. 307, 311 (1987).

Accordingly, Defendants respectfully submit that none of the Defendants violated Plaintiff's First Amendment rights, and the District Court's order and judgment should be affirmed.

**I.    The District Court properly granted the individual-capacity Defendants' Motion to Dismiss on the basis that qualified immunity barred Plaintiff's claims.**

To determine whether a complaint should survive a qualified immunity-based motion to dismiss, the court exercises its "sound discretion" in applying a two-pronged test to the plaintiff's allegations: one, whether a constitutional violation occurred, and two, whether the

17

right violated was clearly established. *Tobey v. Jones*, 706 F.3d 379, 385 (4th Cir. 2013) (citations omitted).

"The doctrine of qualified immunity protects police officers and public officials from claims of constitutional violations 'for reasonable mistakes as to the legality of their actions.'" *Merchant v. Bauer,* 677 F.3d 656, 661 (4th Cir.), *cert. denied, 568* U.S. 1068 (2012) (quoting *Saucier v. Katz,* 533 U.S. 194, 206 (2001)). "Qualified immunity extends to protect officials 'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Williams v. Ozmint,* 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Henry v. Purnell,* 652 F.3d 524, 531 (4th Cir.) (en banc), *cert. denied,* 565 U.S. 1062 (2011)); *accord Durham v. Horner,* 690 F.3d 183, 188 (4th Cir. 2012). The purpose of qualified immunity is to "remove most civil liability actions, except those where the official clearly broke the law…" *Id.* Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.*

Furthermore, even the out of circuit cases cited by Plaintiff are inapposite. There is a significant distinction between recording a law enforcement encounter and posting it online after the fact (which

18

Plaintiff was informed was permissible) and livestreaming in real time, which poses legitimate concerns for officer safety and may interfere with the purpose of the lawful police activity. Notably, none of the cases relied on by Plaintiff involved livestreaming. The U.S. Supreme Court has held numerous times in recent years that "clearly established law" should not be defined "at a high level of generality." *See e.g., White v. Pauly*, 137 S. Ct. 548, 552 (2017); *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018); *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019).

The District Court correctly concluded that, "[t]here is no precedent from the Supreme Court, the Fourth Circuit, or the Supreme Court of North Carolina that clearly established this legal right [to livestream] on October 9, 2018." (JA62).

A.    <u>Plaintiff did not have a clearly established right to livestream on social media while he was seized during a traffic stop.</u>

As Plaintiff has conceded, the only time the Fourth Circuit has weighed in on the issue of the right to record police, it held that the right to record was not clearly established. (Pl.'s Resp. in Opp. to Partial Mot. to Dismiss, DE 19 at 5) (*citing Szymecki v. Houck*, 353 F. App'x 852 (4th Cir. 2009) (per curiam) (unpublished)). Although "this Court's caselaw does not require a case directly on point for a right to be clearly

established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela*, 138 S. Ct. at 1152 (*citing White*, 137 S. Ct. at 551). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.*

It is axiomatic that if the right to record is not clearly established, the right to livestream, which poses officer safety issues not implicated by mere recording, cannot be clearly established.

The fact that Plaintiff is forced to rely on out of circuit cases on the right to record law enforcement in an attempt to establish the right to live-stream law enforcement encounters in the Fourth Circuit only serves to illustrate the lack of clearly established law on livestreaming. As the District Court noted, "[a]lthough other circuit courts have published opinions recognizing the right to record police in performing their public duties, no circuit court has addressed the right of a passenger in a stopped vehicle during a traffic stop to record and real-time broadcast police in performing their public duties." (JA62). For this reason alone, Officer Helms is entitled to qualified immunity as to any claim that he violated Plaintiff's constitutional right to livestream. *See, e.g., Wilson v. Layne,* 141 F.3d 111, 114 (4th Cir.1998) (en banc) (holding that the law

in the Fourth Circuit cannot be clearly established by cases in other circuits).

Plaintiff's arguments ask this Court to ignore both Fourth Circuit precedent (by relying on out of circuit cases to clearly establish laws in the Fourth Circuit) and the United States Supreme Court (by attempting to have this court analyze the right broadly as a right to "record" rather than the more specific right to "livestream"). The lack of even a single case in Plaintiff's brief even discussing the right to livestream shows that there is no clearly established right to livestream, in the Fourth Circuit or elsewhere. As such, Officer Helms did not violate any clearly established rights of the Plaintiff and is therefore entitled to qualified immunity to the claims brought against him in his individual capacity.

> 1.  Passengers in stopped vehicles do not have a clearly established right to record and broadcast police during a lawful stop in the Fourth Circuit.

Plaintiff's status as a passenger in a lawfully seized vehicle also bears upon the analysis, as Plaintiff is considered "seized" for the duration of the traffic stop. *See e.g., Brendlin v. California,* 551 U.S. 249, 255 (2007). The United States Supreme Court has made clear that a passenger's liberty interests must be balanced against the public interest

in officer safety. *See, e.g., Maryland v. Wilson*, 519 U.S. 408 (1997).
Plaintiff's arguments simply ignore this necessary balancing, and instead
rely on authorities addressing the activities of bystanders or persons who
were not seized at the time of their First Amendment activities. These
cases are inapposite to Plaintiff's claims as a passenger in a lawfully
stopped vehicle.

Plaintiff relies on *Dyer v. Smith*, No. 3:19-CV-921, 2021 WL 694811
(E.D. Va. Feb. 23, 2021), in which the plaintiff alleged that his First and
Fourth Amendment rights were violated when TSA agents stopped him
from recording a pat-down search of his husband and ordered him to
delete the video he had already taken. 2021 WL 694811, at *1. The
plaintiff in *Dyer* had not been stopped by the TSA agents himself. The
record did not show that his recording of the pat-down interfered in any
way with the pat-down or posed a danger to the TSA agents, given the
highly controlled environment. *Id.* Finally, the officers allegedly ordered
him to delete a video after recording had taken place, a prior restraint
that is presumed unconstitutional. *Id.*

Likewise, Plaintiff's reliance on *Hulbert v. Pope*, No. SAG-18-00461,
2021 WL 1599219, at *8 (D. Md. 2021), is misplaced. In that case, which

22

is currently on appeal at the Fourth Circuit, the U.S. District Court in Maryland held that "the right to record police officers and other matters of public concern in a safe manner that does not interfere with the police's ability to carry out their duties was clearly established" at the time of the events of that case on February 5, 2018. *Id.* However, that case involved a protester who claimed that his right to record law enforcement was violated when he was arrested while filming officers on a public street. The Court found that the stated grounds for arrest, Plaintiff's failure to move off the sidewalk as ordered, may have violated the First Amendment in and of itself. As such, Plaintiff in *Hulbert* was subjected to a potentially unlawful arrest which prevented him from filming, as opposed to Plaintiff in this case, who was already the subject of a traffic stop that has not been challenged as unlawful. *Id.*

In the present case, even assuming *arguendo* that the right to record was clearly established, which is denied, Plaintiff's claim is not that he was denied the right to record, as he was told repeatedly that he could record. Rather, Plaintiff's claim involves the right of a passenger in vehicle in a lawful traffic stop to livestream the traffic stop. Plaintiff has not cited a single case that addresses this alleged right, much less one

that clearly establishes such a right. In fact, as set forth more fully below, the case law supports the opposite result – that officers are allowed to "exercise command of the situation" and intrude on the occupants' personal liberties to carry out the purpose of the stop and protect officer safety. *See Arizona v. Johnson*, 555 U.S. 323 (2009).

> 2.     A right to livestream police does not obviously flow from the First Amendment and other precedent.

Primarily citing authorities that interpret whether various abuses of prisoners are clearly prohibited by the Eighth Amendment, Plaintiff and *amici* argue that the right to record and broadcast police flows so obviously from the First Amendment that Officers Ellis and Helms were on notice that restricting stopped passengers from livestreaming the stop was unconstitutional. Although even a novel set of circumstances can be clearly unlawful, qualified immunity provides that "in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). As the Supreme Court pointed out in *Hope v. Pelzer*, "the salient question… is whether the state of the law…[at the time of the incident]…gave respondents fair warning that their alleged [conduct] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 731 (2002). Here, the state of the law at the time would have provided no "fair

warning" that the passenger of a vehicle in a traffic stop would have the right to livestream a traffic stop. Even assuming *arguendo* that the passenger had a right to record, which is not at all clear under Fourth Circuit precedent regarding rights of passengers in a traffic stop, there is simply no case cited by Plaintiff, or which Defendant is aware of, in which a Circuit Court has held that there is a right of anyone – much less a passenger in a traffic stop – to livestream a law enforcement stop. As such, the District Court correctly found that such a right was not clearly established at the time of the events of this lawsuit.

B.  <u>Officer Helms did not violate Plaintiff's First Amendment rights.</u>

Plaintiff alleged that Officer Helms, by reaching for his phone and touching his seatbelt and shirt, violated his First Amendment right to record and broadcast his interaction with police when stopped. (JA10-12). As addressed above, such a right is not clearly established. However, under the laws interpreting the First and Fourth Amendments, Plaintiff's rights were not violated by Officer Helms. In fact, Officer Helms did not even prevent Plaintiff from continuing to livestream in this case.

It is true that the First Amendment's protections extend beyond the text's proscriptions on laws abridging freedom of speech and encompass "a range of conduct related to the gathering and dissemination of information." *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011); *see First Nat'l Bank v. Bellotti*, 435 U.S. 765, 783 (1978); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *Turner v. Lieutenant Driver*, 848 F.3d 678, 688-89 (5th Cir. 2017). The First Amendment generally "prohibit[s] the government from limiting the stock of information from which members of the public may draw," *see First Nat'l Bank*, 435 U.S. at 783; *Turner*, 848 F.3d at 688, so long as it is gathered "by means within the law." *See Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (quotation omitted); *Glik*, 655 F.3d at 82. "Gathering information about government officials in a form that can be readily disseminated serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.'" *Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014) (quoting *Mills v. Alabama*, 384 U.S. 214, 218-19 (1966)).

Plaintiff has argued that the right to record and broadcast police while stopped implicates the following First Amendment rights: "(1) the right to discuss, debate, and criticize the actions of government officials;

26

(2) the right to create and disseminate information; (3) the right of individuals to receive truthful information; and (4) the right to access places traditionally open to the public, which encompasses the right to listen, observe, and learn." (Br., COA Doc. 18 at 21-22). Plaintiff states, without citation to authority, that the scope of the protection does not change at all if the speaker is subject to a Fourth Amendment seizure at the time the speaker wishes to exercise these rights.

Although a traffic stop takes place in a public forum, members of the public are not generally allowed to participate in a traffic stop. For example, in *Glik*, the bystander plaintiff "filmed [the officers] from a comfortable remove" and "neither spoke to nor molested them in any way" (except in directly responding to the officers when they addressed him). 655 F.3d. at 84. "Peaceful recording of an arrest in a public space that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation," but that is not the case here. *See id.* Here, Plaintiff was seized in a lawful traffic stop.

Even under the authorities Plaintiff urges this Court to follow, the right to record is subject to reasonable time, place and manner restrictions, so long as those restrictions are content-neutral.

27

Additionally, the First Amendment interest in live broadcasting is not at the same level as the protecting the basic rights to speak, write, and publish. But even if a right to livestream is subject to the same First Amendment protections as any speech in the public square, the alleged policy preventing livestreaming by vehicle occupants for the duration of a traffic stop is a reasonable time, place, and manner restriction that is narrowly tailored in service of a substantial government interest.

       1.    Any "right to record" is subject to reasonable time, place, and manner restrictions.

In the circuits where a "right to record police" has been found, the right is subject to reasonable time, place, and manner restrictions, as with any non-content-based regulation of public speech. *See Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir.), *cert. denied*, 531 U.S. 978 (2000) (recognizing a "First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct"); *accord Turner*, 848 F .3d at 690 (Fifth Circuit); *Fields v. City of Philadelphia*, 862 F.3d 353, 353 (3d Cir. 2017); *Gericke*, 753 F.3d at 9 (First Circuit); *Amer. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 605 (7th Cir. 2012); *Glik*, 655 F.3d at 84 (First Circuit).

As detailed by the First Circuit in *Project Veritas Action Fund v. Rollins*, 982 F.3d 813 (1st Cir. 2020), *cert. denied*, 142 S. Ct. 560 (2021), the Supreme Court has not indicated that the 'forum based' approach that is used to evaluate a "regulation of speech on government property," necessarily applies to a regulation on the collection of information on public property. 982 F.3d at 835. Rather, instead of the strict scrutiny analysis applied when evaluating speech restrictions in a traditional public forum, an intermediate scrutiny standard should apply. *Id.* at 835-36; *accord Alvarez*, 679 F.3d at 604. This means that the policy should be narrowly tailored to further a substantial government interest, although it need not be the least restrictive means of achieving the government's interests. *Id.* at 836. After all, "the government is under no obligation to permit a type of newsgathering that would interfere with police officers' ability to do their jobs." *Id.*

> 2.  Prohibiting livestreaming during a traffic stop while allowing recording is a content-neutral restriction.

Based upon the allegations of Plaintiff's complaint, the alleged anti-livestreaming policy applies to all traffic stops and is a "blanket" regulation. (*See* Br., COA Doc. 19 at 3). Plaintiff argues that because the alleged policy on livestreaming traffic stops is limited to filming police, it

is an impermissible regulation of content, which should be subject to strict scrutiny. However, this argument confuses the nature of the forum and activity regulated by the restriction with the content of the "speech."

In fact, Plaintiff's reference to the policy as a "blanket" ban on livestreaming support that this restriction is content neutral. "A principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of agreement or disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* The stated reason for the policy from Officers Ellis and Helms was for officer safety, without regard to what message Sharpe was broadcasting. It would apply whether Sharpe was critical or supportive of the actions taken during the stop. Accordingly, the policy is justified without regard to the content of the livestreaming, and that makes it content neutral. *See id.*

For example, federal securities regulations applicable to licensed brokers restrict recommendations that brokers may make in discussions

with their clients regarding securities. This is not a content-based regulation, but rather, it is directed at preventing misrepresentations regarding securities to a population that may be particularly susceptible to harm, which would only be possible within the context of a broker speaking to a client. Here, the alleged policy applies only to promote officer safety and facilitate lawful investigative activities during traffic stops, which necessarily only take place when police stop vehicles.

> 3. The nature of the First Amendment interest in live broadcasting is less significant and subject to fewer protections than other First Amendment-protected activities.

Traditionally, "there is no 'unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish.'" *F.C.C. v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 799 (1978) (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 388 (1969)). Government allocation and regulation of broadcasting was allowed in the service of the public interest due to the scarcity of television and radio spectrum, which if unregulated, led to interference with others' speech. *Id.* The Supreme Court has not revisited these holdings in the context of the expansion of livestreaming platforms provided by social media and the internet. Accordingly, the rule that First

31

Amendment protections for broadcasting are traditionally more limited in service of the public interest has not been changed. As discussed above, important public interests are served by allowing police officers to conduct traffic stops safely and expeditiously. Within the narrow category of broadcasting by persons seized for the duration of a traffic stop, content-neutral restriction of live broadcasting is not inconsistent with First Amendment principles where it serves the public interest.

This public interest is not applicable to bystander recording and bystander broadcasting. Plaintiff conflates the arguments in favor of recording police in public by bystanders with the type of case presented here. A "bystander," by definition, is not part of the interaction between the police and seized individuals. A bystander remains at least some distance apart from the physical location of the stop, posing no or very little safety risk. A bystander would also not interfere with the purpose of the stop.

Furthermore, a prohibition on livestreaming officers during investigative stops leaves open ample alternative channels for communication. Such a restriction would still allow persons to record officers and upload the videos immediately following the interaction. This

would be such a *de minimis* restriction as to border on being nonexistent. To the person filming the officers, there is no meaningful distinction between livestreaming and uploading a video the second the officer leaves. To the officers, this delay may be a matter of life and death.

Finally, it is important to note that no one was stopped from recording or even from livestreaming on this occasion. As such, even if there were a constitutional right to livestream, Plaintiff was not deprived of that alleged right, as he continued to livestream the remainder of the traffic stop. Plaintiff was told that he was free to record, but simply informed that he would not be allowed to use Facebook Live during future stops. The protection of the right to record is not lessened by allowing officers to restrict livestreaming by participants in a traffic stop due to safety concerns or to carry out the purposes of an investigative stop.

> 4. Livestreaming a traffic stop by a seized passenger should be subject to reasonable restrictions.

Plaintiff's arguments that the risks posed by livestreaming to officer safety are "insufficient" and a "fanciful chain of hypotheticals" are unconvincing. These arguments are inaccurate and irresponsible. The Supreme Court has recognized that traffic stops pose significant risks of harm to police officers:

> Traffic stops are especially fraught with danger to police officers, who may minimize the risk of harm by exercising unquestioned command of the situation. …the government's 'legitimate and weighty' interest in officer safety outweighs the 'de minimis' additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle.

*Arizona v. Johnson*, 555 U.S. at 330; *see also Rodriguez v. United States*, 575 U.S. 348, 356-57 (2015); *Maryland v. Wilson*, 519 U.S. at 413; *Michigan v. Long*, 463 U.S. 1032, 1047-48 (1997). For this reason, officers are allowed to "exercise command of the situation" and intrude on the occupants' personal liberties to carry out the purpose of the stop and protect officer safety. *Id.*; *see also Michigan v. Summers*, 452 U.S. 692, 702-03 (1981). This Court has also recognized in multiple decisions that "[a] brief but complete restriction of liberty is valid" during a routine traffic stop. *See United States v. Jones,* 27 F. App'x 198, 200 (4th Cir. 2001) (citing *United States v. Moore,* 817 F.2d 1105, 1108 (4th Cir. 1987)). In one of the decisions that has addressed the right to record police, the need to potentially restrict recording that interferes with police activity is also acknowledged. *See Fields*, 862 F.3d at 360.

The most obvious potential threat to officer safety posed by livestreaming would involve stopping a vehicle with gang members, in a location frequented by gang members, where police could be ambushed

by other members of the gang shortly after livestreaming of the stop began. This is not "farfetched," as claimed by Plaintiff. Gangs routinely conduct activities on social media, which is known to police departments and even used by police departments as an investigative tool to research gang activity. *See*, *e.g.*, *ACLU of Tenn., Inc. v. City of Memphis*, Case No. 2:17-cv-02120-JPM, 2020 WL 4819544 (Aug. 19, 2020) (holding that officers' social media searches for gang activity were part of their investigative activities); *see also* "How emoji can kill: As gangs move online, social media can fuel violence," The Washington Post (June 13, 2018); "Gangs embrace social media with deadly results," Associated Press (June 11, 2018). Police are trained that gangs routinely use social media to coordinate and publicize their activities.

In this case, officers stopped and checked the credentials of Staton, who had recently finished probation for a felony conviction of drug possession with intent to sell.[4] Although Sharpe refused to identify

---

[4] N.C. Dep't of Public Safety Offender Public Information, "Juankesta Jamall Staton," *available at*: https://webapps.doc.state.nc.us/opi/viewoffender.do?method=view&offenderID=0815390&searchLastName=Staton&searchFirstName=Juan&searchGender=M&searchRace=2&searchDOBRange=0&listurl=pagelistoffendersearchresults&listpage=1. A court may take judicial notice of public records when evaluating a motion to dismiss for failure to state a

himself, as Staton complained on the phone, "That man seen two black people, and Dijon [Sharpe] with some glasses on. They thinking drug dealer." (Recording 7:47). Given Staton's criminal history, which would have been known to the officers after looking up the name and date of birth he provided, a reasonable officer would believe it appropriate to take appropriate measures to ensure officer safety. Once Officer Helms saw a Facebook Live interface on Sharpe's phone and confirmed that Sharpe was using Facebook Live, he would have reasonably been concerned for officer safety under the circumstances.

Globally, public safety officials have acknowledged that the rise of livestreaming has coincided with an increase of livestreamed violence. In one notable event, the terrorist who attacked a mosque in Christchurch, New Zealand, killing 49 people, was livestreaming his rampage on Facebook Live. BBC News, "Christchurch shootings: 49 dead in New Zealand mosque attacks," (Mar. 15, 2019), available at https://www.bbc.com/news/world-asia-47578798. This led to Facebook restricting its livestreaming services. *See* Cade Metz and Adam

---

claim. *See, e.g.*, Fed. R. Evid. 201; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

Satariano, "Facebook Restricts Live Streaming After New Zealand Shooting," The New York Times (May 14, 2019), available at: https://www.nytimes.com/2019/05/14/technology/facebook-live-violent-content.html.

The connection of livestreaming to violence has also occurred in police-citizen encounters and has even resulted in attacks on law enforcement officers. Last year, a man set up a Facebook Live stream on his phone to record and broadcast himself attacking Florida police officers with a brick. *See* Xander Landen, "Man Sets Up Facebook Livestream Before Attacking Florida Police Officers with Brick," Newsweek (Sept. 25, 2021). The Florida man's motivations in attacking officers was not clear, but the recording made it evident that livestreaming played a large role in his attack.

In another encounter, a man set himself up to livestream via Facebook Live before engaging officers in a deadly high-speed chase. *See* Tim Stelloh, "Minnesota man killed by police after apparently live streaming chase," NBC News (Sept. 9, 2019), *available at*: https://www.nbcnews.com/news/us-news/minnesota-man-killed-police-after-live-streaming-chase-n1051291. In the footage of the Minnesota

encounter, the subject, Brian Quinones, could be seen calmly driving, playing music, and checking his rearview mirror while blue lights flashed behind him. *Id.* Shortly after he exited the car, police could be heard yelling "drop the knife," and Quinones was shot soon after. *Id.* Earlier that day, he had released a rap album and posted a note to Facebook that said "So sorry." *Id.* The footage of Quinones showed clear plans to engage police and livestream the encounter.

Last week, a preliminary report by the FBI showed that intentional killings of police are at the highest level since 1995. *See* Emma Tucker and Priya Krishnakumar, "Intentional killings of law enforcement officers reach 20-year high, FBI says," CNN (Jan. 13, 2022), *available at*: https://www.cnn.com/2022/01/13/us/police-officers-line-of-duty-deaths/index.html. In the face of this data, Plaintiff's scoffing at the importance of officer safety is not only unpersuasive; it is irresponsible.

The safety-based and investigation-based justifications are not obviated by allowing Staton to make a phone call during the stop. As we heard on the Facebook Live recording, Staton was complaining to an unintelligible female-voiced person on the other end of the phone that *she* told him to go through Winterville, he had just passed her family's house,

38

and now he was stopped by officers while wearing a dirty shirt and basketball shorts. (Recording 2:07-2:27; 11:29-11:33). The officers might have reasonably presumed that Staton was on the phone to his wife or girlfriend. On the other hand, Sharpe was interacting with an unknown audience of an unknown number of people in an unknown location or locations. Additionally, Staton also appears to have stopped his conversation to converse directly with officers whenever requested or appropriate. To be sure, the officers had discretion to require Staton to hang up his phone call during the traffic stop, but simply chose not to exercise that discretion.

In contrast to Staton, Sharpe was distracted by addressing his broadcast audience when officers were trying to speak to him. It is unclear how much of Sharpe's arguments with Officer Helms were legitimate as opposed to performative for the benefit of his livestream audience. Either way, the Facebook Live broadcast interfered with the officers' ability to communicate with Sharpe during the stop. This had the potential to impair officer safety and the officers' ability to investigate.

The safety concerns to officers during traffic stops are significant. The Supreme Court has correspondingly recognized that the liberties of persons seized during traffic stops must sometimes be restricted for officers to control the situation, accomplish the goal of the investigative stop, and maintain safety. As noted by the District Court, the pleadings and case law demonstrate that the Town's alleged policy serves officer and public safety, because "a review of Sharpe's video indicates that Sharpe's livestreaming from inside the stopped car permitted live broadcast from inside the car of the officers' movements, the perspective from within the stopped car, real-time comments from viewers, and geolocation data, [which] undermine an officer's ability to exercise "command of the" traffic stop, thereby increasing the risks to officers and the public. (JA83 (citations omitted)).

Many de minimis restrictions on personal liberties have been constitutionally applied to passengers in a vehicle subject to an investigative stop. The Supreme Court has confirmed that a police officer effectively seizes "everyone in the vehicle," the driver and all passengers, for the duration of a traffic stop. *Brendlin*, 551 U.S. at 255. As discussed above, the risk of harm to both the police and the occupants of a stopped

vehicle is minimized, if the officers routinely exercise unquestioned command of the situation. *See Maryland v. Wilson*, 519 U.S. at 414 (citations omitted). That safety-based interest justifies ordering driver and passengers to get out of the vehicle pending completion of the stop. *Id.* Officers may seize any weapons or contraband in plain view, even if unrelated to the purpose of the stop. *Michigan v. Long*, 463 U.S. at 1049. If there is reasonable suspicion that any occupant may be armed and dangerous, the officer may also perform a pat-down or frisk of that person or search areas in the passenger compartment of a vehicle where a weapon may be hidden. *Id.* at 1049-50. During the stop, the officers may ask passengers to identify themselves and ask them questions unrelated to the justification for the stop, so long as they do not measurably extend the duration of the stop. *Arizona v. Johnson*, 555 U.S. at 333. The occupants, including passengers, are not free to terminate the encounter or move about at will. *Id.* Once a lawful stop begins, the temporary seizure and these *de minimis* restrictions on personal liberties are considered <u>reasonable</u> until the stop ends. *Id.* In fact, the Fourth Circuit has held that, "a brief but complete restriction of liberty is valid during a

routine traffic stop." *Jones,* 27 F. App'x at 200, (*citing Moore,* 817 F.2d at 1108).

Plaintiff has not challenged the lawfulness of the stop or its duration at any point in this litigation. Plaintiff disclaimed any reliance on the Fourth Amendment in briefing and oral argument to the District Court. (JA56). Plaintiff explicitly demonstrated submission to the seizure when he asked Officer Helms whether they could walk together to view the stop sign, Officer Helms said no, and Plaintiff said nothing further. There are many restrictions on passenger liberties that are allowed under the Fourth Amendment during a traffic stop in service of officer safety and the purpose of the stop. In view of these permissible restrictions, Plaintiff has not demonstrated that it is unreasonable to restrict a person from conduct an uninterrupted livestream broadcast of a traffic stop, during the traffic stop. As a reasonable restriction on Plaintiff's activities during the stop, Officer Ellis and Officer Helms were allowed to tell Plaintiff that he was prohibited from livestreaming during the stop without violating Plaintiff's constitutional rights.

> 5. The alleged policy prohibiting livestreaming during traffic stops is narrowly tailored to achieve a substantial government interest.

A content-neutral regulation will be sustained if "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). An ordinance is narrowly tailored if it "'promotes a substantial government interest" and "does not burden substantially more speech than is necessary to further the government's legitimate interests." *Ross v. Early*, 746 F.3d 546, 552 (4th Cir. 2014); *see also Ward*, 491 U.S. at 798-99).

It is well-established that the government has a substantial, weighty, and legitimate interest in officer safety. *See United States v. Stanfield*, 109 F.3d at 979-80; *Wilson*, 519 U.S. at 412-14 (stating that the public interest in officer safety is "both legitimate and weighty"); *Rodriguez*, 575 U.S. at 356-57; *Johnson*, 555 U.S. at 330-32; *Long*, 463 U.S. at 1047-48. As discussed at length above, livestreaming implicates officer safety in several potential respects.

Additionally, the Fourth Circuit has consistently recognized that "a city has a 'legitimate interest in maintaining the safety, order, and

accessibility of its streets and sidewalks.'" *Green v. City of Raleigh*, 523 F.3d 293, 301 (4th Cir. 2008) (quotation omitted). In order to enforce safety-related traffic laws, the City of Winterville police officers involved here stopped Staton's vehicle and opened a forum for interaction between Officers Ellis and Helms, and Plaintiff and Staton. During that interaction, Officers Ellis and Helms told Plaintiff that he could record, but could not livestream, due to concerns for officer safety. The Town of Winterville has a legitimate interest in its officers carrying out traffic stops and doing so safely. These interests are substantial and entirely unrelated to the "suppression of free expression."

Further, the alleged policy is sufficiently limited in scope and duration that it is narrowly tailored – it "does not burden substantially more speech than is necessary to further the government's legitimate interests." The alleged policy prohibits livestreaming from inside a stopped car during a traffic stop, but, as the District Court reasoned, the alleged policy "does not prohibit a person who is not the subject of the traffic stop and who is not inside the stopped car from recording and livestreaming the traffic stop. Accordingly, "[o]n its face, the [p]olicy does no more than target and eliminate the exact source of the evil it seeks to

remedy." (JA84 (citing *Ross*, 746 F.3d at 557; *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)).

The policy also allows ample channels for Plaintiff to communicate his message, in accord with a long line of decisions that allow officers to limit expressive activities to part of a public forum. *See, e.g., Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1393 (D.C. Cir. 1990) ("[T]he [Supreme] Court has generally upheld regulations which merely limit expressive activity to a specific part of the regulated area ....."). Social media sites are the "modern public square." *See Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). Like officers moving large groups of protestors from a sidewalk to a specific public area for safety purposes, government may still impose specific, narrowly tailored restrictions on social media participation in service of important public interests. Preventing Plaintiff from broadcasting on Facebook Live for a narrow span of time is not akin to the total social media ban on sex offenders reviewed by the Supreme Court in *Packingham*. Rather, it is a specific and narrowly tailored restriction of the type that the *Packingham* court envisioned might be permissible under the First Amendment to serve important public purposes.

While within the traffic stop and "seized" under the Fourth Amendment, livestreaming from a participant in a traffic stop for the short duration of the traffic stop merely briefly delays uploading the video and ultimately making the criticism of government officials supported by the First Amendment. Plaintiff would still have access to the social media platform and "ample channels" for Plaintiff's intended expression, simply 15 minutes later in time. This would be analogous to the time it might take officers to move protestors from the street to a designated protest area and consistent with constitutionally permissible limitation of access to part of a public forum.

The alleged policy prohibiting livestreaming by vehicle occupants for the duration of a traffic stop is a reasonable time, place and manner restriction that is content-neutral and narrowly tailored in service of a substantial government interest – officer safety. Accordingly, the alleged policy and Officer Helms' acts enforcing it did not violate Plaintiff's First Amendment rights. As such, District Court properly dismissed Plaintiff's claims.

C. <u>Plaintiff's First Amendment retaliation claims were properly dismissed.</u>

Plaintiff must establish three elements to prove a First Amendment § 1983 retaliation claim. First, the plaintiff must demonstrate that his or her speech was protected. *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685-86 (4th Cir. 2000) (citing *Huang v. Bd. of Governors,* 902 F.2d 1134, 1140 (4th Cir. 1990)). Second, the plaintiff must demonstrate that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech. *Id.* (*citing ACLU v. Wicomico County, Md.,* 999 F.2d 780, 785 (4th Cir.1993) (stating that "a showing of adversity is essential to any retaliation claim"). Third, the plaintiff must demonstrate that a causal relationship exists between its speech and the defendant's retaliatory action. *Id.* (citing *Huang,* 902 F.2d at 1140).

As discussed above, Plaintiff's right to record and livestream is not necessarily protected under the First Amendment. Additionally, Plaintiff cannot establish any retaliatory action which adversely affected the plaintiff's constitutionally protected speech, a showing which is "essential to any retaliation claim." *ACLU v. Wicomico County,* 999 F.2d at 785. The video recording makes clear that Officer Helms abandoned his efforts to prevent Plaintiff from live-streaming, and Plaintiff was allowed to continue live-streaming for the duration of the encounter. Although

47

Officer Helms (legitimately) briefly attempted to grab Plaintiff's phone and told him that Facebook Live was not allowed, Plaintiff was not actually prevented from livestreaming at any point. As such, Plaintiff cannot establish that his alleged constitutionally protected speech was adversely affected, even if a right to record is "assumed without deciding," as the District Court said in its analysis.

Plaintiff's status as a passenger in a vehicle lawfully stopped and seized under the Fourth Amendment negates the causal relationship between Officer Helms' actions and telling Plaintiff his livestreaming activities would be prohibited in future. If a person who has been stopped has an unqualified right to livestream his interaction with the officer who stopped him, any action by the officer that could be interpreted as chilling, even one reasonably justified by the lawful purpose of the stop, could subject the officer to a claim for retaliation. The Supreme Court has opposed subjecting officers to "undue apprehension of being sued" while they undertake their duties, which involve "making quick decisions in 'circumstances that are tense, uncertain, and rapidly evolving.' *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Under the Supreme Court's holding in *Nieves*, a plaintiff

48

must establish that there was no probable cause for an arrest to make a claim of First Amendment retaliation. *Id.* Under the same reasoning, officers should be allowed to carry out those activities that are authorized during a lawful *Terry* stop without being subjected to a First Amendment retaliation claim. If a plaintiff could establish that a stop was not supported by reasonable suspicion or the officer took an action was not within the scope of activities authorized during a stop, then the test described in *Nieves* would apply: "the plaintiff must show that the retaliation was a substantial or motivating factor behind the [action] and, if that showing is made, the defendant can prevail only by showing that the [action] would have been initiated without respect to retaliation." *See Nieves*, 139 S. Ct. at 1725. Those would allow officers to maintain the status quo during dangerous traffic stops and expediently carry out the purpose of the stop without "undue apprehension of being sued."

As discussed above, many decisions of the Supreme Court and the Fourth Circuit recognize that certain personal liberties of persons lawfully seized during a traffic stop must be restricted. It logically follows that an officer may impose certain de minimis intrusions on a seized vehicle occupant in service of the investigation or officer safety. Where

such impositions are legally justified, the causal link necessary to establish First Amendment retaliation would break, consistent with the Supreme Court's holding in *Nieves* in the context of retaliatory arrest. Officer Helms was justified in believing that Plaintiff's Facebook Live broadcast could pose a threat to officer safety, and he had the right to stop Sharpe from livestreaming to maintain the status quo of the traffic stop. Officers making routine traffic stops "are authorized to 'take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.' " *United States v. Leshuk,* 65 F.3d 1005, 1109 (1995) (alteration in original) (quoting *United States v. Hensley,* 469 U.S. 221, 235 (1985)).

Officer Helms' actions were a de minimis intrusion on Plaintiff's liberties, within the broad scope of permissible intrusions on passenger liberties during investigative stops. Accordingly, for this reason, in addition to the lack of adverse effect on Plaintiff's livestream, the District Court properly decided that Plaintiff's First Amendment retaliation claims should be dismissed.

**II.    The District Court properly granted the official-capacity Defendants' Motion for Judgment on the Pleadings on the basis that the Town of Winterville had not adopted an unconstitutional policy.**

The official-capacity Defendants obtained dismissal of Plaintiff's claims against them pursuant to a Motion for Judgment on the Pleadings. (JA71-73).[5] Federal Rule of Civil Procedure 12(c) provides that, "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." A motion for judgment on the pleadings under Rule 12(c) is determined under the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). In resolving a motion for judgment on the pleadings, the court must accept all of the non-movant's factual allegations as true and draw all reasonable inferences in its favor. *Bradley v. Ramsey*, 329 F. Supp. 2d 617, 622 (W.D.N.C. 2004). Judgment on the pleadings is appropriate if, taking all of the non-moving party's factual allegations as true, the

---

[5] Prior to the official-capacity Defendants' motion, the District Court dismissed the named Defendant "Winterville Police Department," because Plaintiff's is official-capacity claims against Officers Ellis and Helms were tantamount to bringing suit against the municipality itself – the Town of Winterville.[5] *See Moore v. City of Creedmoor*, 345 N.C. 356, 367, 481 S.E.2d. 14, 21 (1997) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). The alleged entity "Winterville Police Department" is not capable of being sued under North Carolina law, which was well-supported before the District Court. (*See* JA57-59). Plaintiff has not briefed this decision by the District Court; accordingly, it has been waived. Defendants request that this Court affirm the decision.

movant demonstrates that there is no genuine issue of material fact and that movant is entitled to judgment as a matter of law. *Id.* Like a Rule 12(b)(6) motion to dismiss, the court must accept all well-pleaded factual allegations as true and construe the facts in the light most favorable to the plaintiff, and a "pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, a court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences" or "allegations that contradict matters properly subject to judicial notice or by exhibit." *Jefferson v. Sch. Bd. of City of Norfolk*, 452 F. App'x 356, 357 (4th Cir. 2011) (citation omitted).

Plaintiff's Complaint alleged that the Town of Winterville Police Department had "an unconstitutional policy, custom, or practice of preventing citizens from recording and livestreaming their interactions with police officers in the public performance of their duties." Plaintiff also sought a declaration that (a) he has a First Amendment-protected right to record police during the public performance of their duties and (b) his right to record police also includes the right to broadcast such

recordings in real-time, regardless of whether or not any other individuals view such a broadcast." (JA11).

To find the official-capacity defendants liable, Plaintiff must sufficiently allege that a "'policy or custom" attributable to the Town of Winterville caused the violation of his federally protected rights on the date of the incident – October 9, 2018. *See Am. Mfrs. Mut Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). Such a policy or custom may arise in one of four ways: (1) an official, express policy, such as a written ordinance or regulation; (2) through the decision of a person with "final policymaking authority," (3) through an omission, such as a failure to properly train officers, that manifests "deliberate indifference" to citizens' rights; or (4) through a practice that is so "persistent and widespread" and "permanent and well settled" that it constitutes "custom or usage with the force of law." *Id.*

Plaintiff's *Monell* claim cannot arise from the decision of a Town official with "final policymaking authority," because Plaintiff's factual allegations concern only Officers Ellis and Helms, who do not have final policymaking authority, a fact stipulated to by Plaintiff at the District Court. Thus, to proceed on his *Monell* claim, Plaintiff must allege facts

making it plausible that the Town had an express policy, an omission manifesting deliberate indifference to citizens' rights, or a practice so persistent and widespread that it had the force of a policy or custom, that caused the alleged constitutional violation. However, Plaintiff's Complaint does not allege that the Town had an official written policy regarding livestreaming, and the facts pled by Plaintiff and reasonable inferences therefrom do not plausibly claim an omission that manifests "deliberate indifference" or a widespread practice that would rise to the standard required for *Monell* liability. It is "well settled that 'isolated incidents' of unconstitutional conduct by subordinate employees are not sufficient to establish a custom or practice for § 1983 purposes." *Lytle v. Doyle*, 326 F.3d 463, 473 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)). Likewise, pleading an omission, like lack of training, that shows "deliberate indifference" also requires that policymakers were aware of, and acquiesced in, a pattern of constitutional violations." *Id.*, 326 F.3d at 474 (quoting *Canton v. Harris*, 489 U.S. 378, 397 (1989) (O'Connor, J., concurring in part and dissenting in part)). Plaintiff's factual allegations do not allege a widespread practice or a pattern of constitutional violations, because the Complaint

describes only one isolated incident involving patrol officers. Defendants'
single act of preventing Plaintiff from livestreaming his interaction with
them is insufficient to plead municipal liability. As such, Plaintiff has not
adequately alleged a *Monell* claim, and his claims against the Town of
Winterville were properly dismissed.

In its order dismissing Plaintiff's *Monell* claim, the District Court
"assume[d] without deciding that Sharpe ha[d] plausibly alleged a policy
or custom attributable to the Town of Winterville under *Monell* that
prohibited a person during a traffic stop and from inside the stopped car
to livestream. the traffic stop." (JA78). Even assuming arguendo that
such a policy existed, it would be well within constitutional bounds.

As recognized by the District Court, the alleged policy is narrowly
tailored to serve a substantial government interest – officer safety. It has
long been recognized that the public has a "paramount interest in officer
safety." *United States v. Stanfield*, 109 F.3d 976, 979-80 (4th Cir. 1997).
Further, the policy does not burden "substantially more speech than is
necessary to further the government's legitimate interests." *Ross*, 746
F.3d at 557. The policy prohibits only livestreaming from inside the car
during a traffic stop. The alleged policy does not prevent recording from

inside the car, nor does it prevent livestreaming from someone who is not inside the stopped vehicle. (JA84).

Further, a prohibition on livestreaming officers during investigative stops leaves open ample alternative channels for communication. Such a restriction would still allow persons to record officers and upload the videos immediately following the interaction. This would be such a *de minimis* restriction as to border on being nonexistent. To the person filming the officers, there is no meaningful distinction between livestreaming and uploading a video the second the officer leaves. To the officers, this delay may be a matter of life and death.

As discussed above, Sharpe was not deprived of a right secured by the constitution as of October 9, 2018, and the policy did not infringe upon his First Amendment rights.

<u>CONCLUSION</u>

For the reasons set forth above, the District Court was correct in its decision to dismiss Plaintiff's claims. Defendants respectfully request that this Court AFFIRM the District Court's orders and judgment.

56

This the 18th day of January, 2022.

**HARTZOG LAW GROUP LLP**

/s/ *Dan M. Hartzog Jr.*
DAN M. HARTZOG, JR.
N.C. State Bar No. 35330
E-mail: dhartzogjr@hartzoglawgroup.com
KATHERINE BARBER-JONES
N.C. State Bar No. 44197
E-mail:  kbarber-jones@hartzoglawgroup.com
2626 Glenwood Avenue, Suite 305
Raleigh, North Carolina 27608
Telephone: (919) 670-0338
Facsimile: (919) 714-4635
*Attorneys for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limits of Fed. R. App. P. 32(a)(7)(B), because, excluding the parts of the document exempted by the Rule, this document contains 10,902 words. This document complies with the typeface, size, and style requirements of Fed. R. App. P. 32(a)(5)-(6), because this document has been prepared in a proportionally-spaced typeface in Microsoft Word, Century Schoolbook, double-spaced, using 14 point font.

This the 18th day of January, 2022.

**HARTZOG LAW GROUP LLP**

/s/ *Dan M. Hartzog Jr.*
DAN M. HARTZOG, JR.
N.C. State Bar No. 35330
E-mail: dhartzogjr@hartzoglawgroup.com
KATHERINE BARBER-JONES
N.C. State Bar No. 44197
E-mail: kbarber-jones@hartzoglawgroup.com
2626 Glenwood Avenue, Suite 305
Raleigh, NC 27608
Telephone: (919) 670-0338
Facsimile: (919) 714-4635
*Attorneys for Defendants-Appellees*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on date below I electronically filed the foregoing *Opening Brief of Appellees* via the Court's CM/ECF system, while will effect service upon counsel of record.

This the 18th day of January, 2022.

**HARTZOG LAW GROUP LLP**

/s/ *Dan M. Hartzog Jr.*
DAN M. HARTZOG, JR.
N.C. State Bar No. 35330
E-mail: dhartzogjr@hartzoglawgroup.com
KATHERINE BARBER-JONES
N.C. State Bar No. 44197
E-mail:  kbarber-jones@hartzoglawgroup.com
2626 Glenwood Avenue, Suite 305
Raleigh, NC 27608
Telephone: (919) 670-0338
Facsimile: (919) 714-4635
*Attorneys for Defendants-Appellees*