RECORD NO. 21-1827

In The
# United States Court of Appeals
### For The Fourth Circuit

## DIJON SHARPE,

*Plaintiff – Appellant,*

**v.**

## WINTERVILLE POLICE DEPARTMENT;
## WILLIAM BLAKE ELLIS, in his official capacity only;
## MYERS PARKER HELMS, IV,
## in his individual and official capacity,

*Defendants – Appellees.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### AT RALEIGH
―――――――――

### *AMICUS CURIAE* BRIEF OF THE SOUTHERN STATES POLICE
### BENEVOLENT ASSOCIATION IN SUPPORT OF
### APPELLEES SEEKING AFFIRMANCE
―――――――――

J. Michael McGuinness
THE MCGUINNESS LAW FIRM
2034 Highway 701 North
Post Office Box 952
Elizabethtown, North Carolina  28337
(910) 862-7087

*Counsel for Amicus Curiae*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and Local Rule 26.1, the Southern States Police Benevolent Association ("PBA") is a private, nonprofit law enforcement officer association under Section 501(c)(5) of the Internal Revenue Code.

PBA makes the following disclosures: 1. It is not a publicly held corporation. 2. It does not have any parent corporation. 3. No publicly held corporation or other publicly held entity owns 10 percent or more of its stock. 4. No publicly held corporation or other publicly held entity has a direct financial interest in the outcome of this litigation. 5. This case does not arise out of a bankruptcy proceeding. 6. This is not a criminal case in which there was an organizational victim.

Dated: January 25, 2022          /s/ J. Michael McGuinness
                                 Counsel for Amicus Curiae PBA

# TABLE OF CONTENTS

**Page**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ........................i

TABLE OF CONTENTS ...............................................ii

TABLE OF AUTHORITIES ..........................................iv

I.    INTEREST OF *AMICUS CURIAE* PBA .........................1

II.   ISSUE PRESENTED ........................................2

III.  SUMMARY OF ARGUMENT ...............................2

IV.   ARGUMENT ................................................6

    A.    INCREASING VIOLENCE AGAINST POLICE OFFICERS REAFFIRMS THE CRUCIAL NEED FOR PROTECTING THE SAFETY OF POLICE STOP SCENES AND ONGOING POLICE INVESTIGATIONS; LIVESTREAMING FROM WITHIN ONGOING CRIMINAL INVESTIGATIONS IS NOT PROTECTED ..............................................6

        1.    The Growing Multiple Dangers to Police Officers........8

        2.    Vehicle Stops Pose Unique and Substantial Inherent Risks to Officers...........................................13

        3.    Roadside Traffic Stops Are Inherently Dangerous .....18

B.  THE DISTRICT COURT CORRECTLY DISMISSED THE INDIVIDUAL CAPACITY CLAIMS BASED ON QUALIFIED IMMUNITY BECAUSE THERE IS NO CLEARLY ESTABLISHED CONSTITUTIONAL RIGHT TO ENGAGE IN LIVESTREAMING BROADCASTING DURING A POLICE INVESTIGATION FROM A STOP SCENE .......... 21

1.  The Doctrine of Qualified Immunity in Law Enforcement Disputes Includes Special Principles to Protect Officers From Death And Bodily Injury From Subjects Of Criminal Investigations ................. 22

2.  Law Enforcement Determinations Require an Objective Reasonableness Standard and The Could Have Believed Standard Because Officers Are Entitled to Qualified Immunity If They Reasonably Could Have Believed That Their Conduct Was Appropriate ........................................... 27

V.  LIMITED RESPONSE TO PLAINTIFF'S SIX AMICI: POLICE REFORM EFFORTS MUST GENERALLY BE ADDRESSED TO LEGISLATIVE BODIES OR THE SUPREME COURT ....................................................... 28

VI.  CONCLUSION ................................................................ 32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Russell,*
   247 F.3d 125 (4th Cir. 2001) ........................................................ 24

*Arizona v. Johnson,*
   555 U.S. 323 (2009) ............................................................... 13, 18

*Ashcroft v. al-Kidd,*
   131 S. Ct. 2074 (2011) .................................................................. 26

*City of Escondido, Cal. v. Emmons,*
   139 S. Ct. 500 (2019) ............................................................. 22, 24

*District of Columbia v. Wesby,*
   138 S. Ct. 577 (2018) ............................................................. 26, 31

*Driebel v. City of Milwaukee,*
   298 F.3d 622 (7th Cir. 2002) ........................................................ 22

*Edwards v. City of Goldsboro,*
   178 F.3d 231 (4th Cir. 1999) .................................................... 23, 27

*Fields v. City of Philadelphia,*
   862 F.3d 353 (3d Cir. 2017) ........................................................... 7

*Frasier v. Evans,*
   992 F.3d 1003 (10th Cir. 2021) .................................... 7, 29, 30, 31

*Garcia v. Montgomery Cty.,*
   145 F. Supp. 3d 492 (D. Md. 2015) ................................................. 5

*Garrity v. New Jersey,*
   385 U.S 493 (1967) ...................................................................... 22

iv

*Hunter v. Bryant,*
 504 U.S. 224 (1991) ...................................................................... 23

*Hunter v. Mocksville,*
 789 F.3d 389 (4th Cir. 2015) ...................................................... 22

*Kelly v. Borough of Carlisle,*
 622 F.3d 248 (3d Cir. 2010) ................................................... 7, 21

*Lassiter v. Alabama A&M Univ.,*
 28 F.3d 1146 (11th Cir. 1994) ................................................... 25

*Malley v. Briggs,*
 475 U.S. 335 (1986) ..................................................................... 25

*Marvin v. City of Taylor,*
 509 F.3d 234 (6th Cir. 2007) ...................................................... 28

*Maryland v. Wilson,*
 519 U.S. 408 (1997) ............................................................... 13, 20

*Menuel v. City of Atlanta,*
 25 F.3d 990 (11th Cir. 1994) ...................................................... 12

*Michigan v. Long,*
 463 U.S. 1032 (1997) ............................................................. 13, 20

*Michigan v. Summers,*
 452 U.S. 692 (1981) ..................................................................... 13

*Mocek v. City of Albuquerque,*
 3 F. Supp. 3d 102 (D.N.M. 2014) ................................................ 5

*Mocek v. City of Albuquerque,*
 813 F.3d 912 (10th Cir. 2015) .................................................... 23

*Parish v. Hill,*
 350 N.C. 231, 513 S.E.2d 547 (N.C. 1999) .................................. 12

*Park v. Shiflet,*
 250 F.3d 843 (4th Cir. 2001) ........................................................ 27

*Pennsylvania v. Mimms,*
 434 U.S. 106 (1977) ................................................................. 19-20

*Plumhoff v. Rickard,*
 134 S. Ct. 2012 (2014) .................................................................. 25

*Reichle v. Howards,*
 132 S. Ct. 2088 (2012) .................................................................. 26

*Rodriguez v. United States,*
 575 U.S. 348 (2015) ................................................................. 13, 20

*Ross v. Early,*
 746 F.3d 546 (4th Cir. 2014) ........................................................ 21

*Rowland v. Perry,*
 41 F.3d 167 (4th Cir. 1994) .......................................................... 28

*Saucier v. Katz,*
 533 U.S. 194 (2001) ...................................................................... 24

*Scott v. Harris,*
 550 U.S. 372 (2007) ...................................................................... 28

*State v. Anderson,*
 40 N.C. App. 318, 254 S.E.2d 48 (1979) ....................................... 24

*State v. Bryant,*
 65 N.C. 327, 1871 WL 2196 (N.C. 1871) ...................................... 11

*State v. Dunning,*
 177 N.C. 559, 98 S.E.2d 530 (1919) ............................................. 11

*State v. Knotts,*
 168 N.C. 173, 83 S.E.2d 972 (1914) ............................................... 9

*Szymecki v. Houck*,
    353 Fed. Appx. 852 (4th Cir. 2009) ................................................... 5

*True Blue Auctions v. Foster*,
    528 Fed. Appx. 190 (3d Cir. 2013) ................................................... 8

*Turner v. City of Greenville*,
    197 N.C. App. 562, 677 S.E.2d 480 (2009) ..................................... 23

*Turner v. Lieutenant Driver*,
    848 F.3d 678 (5th Cir. 2115) ........................................................... 7

*United States v. Aparico-Soria*,
    740 F.3d 152 (4th Cir. 2014) ......................................................... 11

*United States v. Fager*,
    811 F.3d 381 (10th Cir. 2016) , *aff'd,*
    813 F.3d 912 (10th Cir. 2015) ................................................... 5, 17

*United States v. Stanfield*,
    109 F.3d 976 (4th Cir. 1997) ..................................................... 3, 20

*White v. Pauly*,
    137 S. Ct. 548 (2017) ..................................................................... 26

*Wilson v. Prince George Cty*,
    893 F.3d 213 (4th Cir 2018) ................................................... 22, 24

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I .................................................................... *passim*

U.S. Const. amend. IV .................................................................. *passim*

## RULE

Fed. R. App. P. 29 ........................................................................... 1

## OTHER AUTHORITIES

Blair, et. al., *Occupational Homicides of Law Enforcement Officers, 2003–2013: Data from the National Violent Death Reporting System*, 51 American Journal of Preventive Medicine 188 (2016) ................................................................................... 19, 20, 21

Brandl & Stroshine, *Toward an Understanding of the Physical Hazards of Police Work,* Police Q, 6 (2) (2003) ...................................... 19

*Congressional Resolution*, H. Res. 1071, July 20, 2020, 116th Congress, Second Session...................................................................... 15

Emma Tucker and Priya Krishnakumar, "Intentional killings of law enforcement officers reach 20-year high, FBI says," CNN (Jan. 13, 2022), https://www.cnn.com/2022/01/13/us/police-officers-line-of-duty-deaths/index.html................................................................ 15

Federal Bureau of Investigation. *Law Enforcement Officers Killed and Assaulted 2014.* Washington, DC; U.S. Department of Justice. www.fbi.gov/about-us/cjis/ucr/leoka/2014/officers-feloniously-killed ..................................................................................... 19

*How Gangs Use Social Media* https://blog.e-chatter.net/2019/10/how-gangs-use-social-media/ *Most Gangs Use Social Media* https://www.govtech.com/public-safety/most-gang-members-use-social-media-study-finds.html........................................... 4

MacDonald, *The War on Cops* (2016)...................................................... 10

*National Law Enforcement Officer Memorial Fund, The Risks to The Thin Blue Line*, October 28, 2013; www.fbi.gov/news/stories/203/October............................................. 11, 16

*North Carolina Basic Law Enforcement Training Manual*, Techniques of Traffic Law Enforcement.................................................. 12

*One Year Since the Jan. 6 Attack on the Capitol (justice.gov)*
www.justice,gov/usao/dc-one-year-jan-6-attack-capitol ........................ 10

Scoville, *The Hazards of Traffic Stops*, *Police Magazine* (October 19,
2010) ........................................................................................ 18

*Statement by Attorney General Loretta E. Lynch on Recent Officer
Deaths in Florida*, OJ 17-019, 2017 WL 5533 ........................................ 15

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## *AMICUS CURIAE* BRIEF OF THE SOUTHERN STATES POLICE BENEVOLENT ASSOCIATION IN SUPPORT OF APPELLEES SEEKING AFFIRMANCE OF THE DISTRICT COURT'S ORDER OF DISMISSAL

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Now comes the Southern States Police Benevolent Association and respectfully submits this amicus brief in support of the Appellees seeking affirmance of the District Court's dismissal order holding that Officers Ellis and Helms were entitled to qualified immunity.[1]  The District Court decision was entirely correct and should be affirmed.  There is no case anywhere that has afforded constitutional protection on the facts of this case:  *livestreaming during and from within an ongoing police investigation scene*.

## I.    INTEREST OF *AMICUS CURIAE* PBA

The Southern States Police Benevolent Association (hereafter "PBA") is an eleven state police officer association that promotes more effective law enforcement, and the rights and safety of police officers.  The American police community has a vital interest in the outcome of this case

---

[1] Pursuant to Rule 29, F.R.A.P., this amicus brief was prepared by the undersigned counsel of record.  No counsel of any party authored this brief in whole or in part.  No party or party's counsel, or other person, contributed money to fund this brief.

because, *inter alia*, Plaintiff's position would threaten and undermine the effectiveness of law enforcement functions and the safety of police officers performing their dangerous jobs within the scenes of ongoing criminal investigations.

## II.    ISSUE PRESENTED

Whether the District Court correctly granted dismissal based on qualified immunity where the police officers could have reasonably believed that livestreaming is not constitutionally protected where there is no clearly established Fourth Circuit precedent granting citizens a constitutional right to livestream from and within a law enforcement stop scene with an ongoing police investigation?

## III.    SUMMARY OF ARGUMENT

Plaintiff Dijon Sharpe and his brigade of six amici seek to reverse the District Court's dismissal of individual capacity claims based on qualified immunity where Plaintiff was not permitted to continue to livestream from within an ongoing police investigative operation. However, they fail to cite a single Fourth Circuit or other livestreaming case clearly establishing that citizens have a constitutional right to engage in real time broadcasted livestreaming from and during a police

investigation within the actual scene. The seven lengthy briefs supporting Plaintiff completely fail to recognize or address the unique context and special dangers during a roadside traffic stop – especially with the unique feature here of livestreaming. *See U.S. v. Stanfield*, 109 F.3d 976, 979-80 (4th Cir. 1997) ("paramount interest in officer safety and the extraordinary risks to which law enforcement officials are exposed….").

This case is plainly distinguishable from the "right to record" cases and "bystander recording" cases because, *inter alia*, livestreaming during and from the middle of a criminal investigation is obstructive to the proper handling of a police investigation and poses risks of inciting a potential crowd to unlawfully intervene at the scene. A stopped subject and passengers are expected to keep their hands free, visible and without weapons for everyone's safety. Sharpe's reliance on general "right to record" cases from other circuits are inapposite because this case is remarkably different.

The middle of a police investigative scene with an ongoing criminal investigation is not a public forum where citizens are permitted to subvert police criminal investigators and police operations. There are

also multiple compelling officer and public safety considerations which constitute valid time, place and manner limitations on livestreaming from police stop scenes.

Citizens enjoy no constitutional right to livestream from a police stop scene in the middle of a police investigation. Officers must complete their investigative duties at stop scenes, while being on guard for weapons, erratic drivers and other risk factors. Livestreaming promotes distractions, inherent hazards and risks for officers and citizens at police investigative scenes.

Livestreaming has become a tool for agitating a mob or summoning partners in crime into immediate action during an ongoing police operation at a police stop or incident scene.  Gangs and other criminal enterprises know how to coordinate and ply their illicit trade via social media.[2]  Social media sophistication by gangs often reveals efforts to outfox and outgun the police by obstruction and murder. Gang comrades instantaneously  get  the  signal  from  Facebook  Live.  See

---

[2] *How Gangs Use Social Media* https://blog.e-chatter.net/2019/10/how-gangs-use-social-media/ *Most Gangs Use Social Media* https://www.govtech.com/public-safety/most-gang-members-use-social-media-study-finds.html

*United States v. Fager*, 811 F.3d 381, 388–89 (10th Cir. 2016) (describing the increased threat of "coordinated attack[s]" on officers in the context of traffic stops).

As Plaintiff recognized, the only time that this Court has addressed a general issue of the right to record police, this Court held that the right to record *was not* clearly established. Appellant's brief at 37 *citing Szymecki v. Houck*, 353 Fed. Appx. 852 (4th Cir. 2009) (unpublished). *See Mocek v. City of Albuquerque*, 3 F. Supp. 3d 1002, 1024 (D.N.M. 2014) ("[T]he United States Court of Appeals for the Third Circuit and the United States Court of Appeals for the Fourth Circuit have held that the right [to record] is not clearly established."), *aff'd* 813 F.3d 912 (10th Cir. 2015)(no clearly established right to film police); *Garcia v. Montgomery Cty.*, 145 F. Supp. 3d 492, 508-09 (D. Md. 2015) ("Indeed, the Fourth Circuit, albeit in an unpublished opinion, expressly stated that th[e] right [to record a police officer] is not clearly established."

## IV.  ARGUMENT

### A.  INCREASING VIOLENCE AGAINST POLICE OFFICERS REAFFIRMS THE CRUCIAL NEED FOR PROTECTING THE SAFETY OF POLICE STOP SCENES AND ONGOING POLICE INVESTIGATIONS; LIVESTREAMING FROM WITHIN ONGOING CRIMINAL INVESTIGATIONS IS NOT PROTECTED

While PBA essentially leaves the facts as accurately summarized by Appellees in their brief at 2 – 9 and the record, a couple of points warrant mention. When an Officer asked for identification, Mr. Staton, a passenger, advised that he didn't have it and that "I'm about tired of this mess, man." (JA 22) Early in the police investigative inquiry within the stop scene, Sharpe began yelling and referred to an officer as "boy." (JA 31) Mr. Staton chimed in and referred to an officer as "dog." (JA 31) Mr. Staton had recently completed probation for a felony drug conviction of possession with the intent to sell. See Appellees' brief at 35 and note 4. Mr. Sharpe began addressing his Facebook Live audience, and he appeared to incite them. Officer Ellis advised that they could record but not livestream. (JA 34)

The District Court explained the heart of this case at 480 F. Supp. 3d at 699:

The Supreme Court has long recognized that police officers face unique dangers during traffic stops. See *Rodriguez v. United States*, 575 U.S. 348, 356–57 (2015); *Arizona v. Johnson*, 555 U.S. 323, 330–32 (2009); *Maryland v. Wilson*, 519 U.S. 408, 413 (1997); *Michigan v. Long*, 463 U.S. 1032, 1047–48 (1983). "The risk of harm to the police and the occupants of a stopped vehicle is minimized ... if the officers routinely exercise unquestioned command of the situation." *Johnson*, 555 U.S. at 330; *Wilson*, 519 U.S. at 414; *Michigan v. Summers*, 452 U.S. 692, 702–03 (1981). Indeed, during the officers' interaction with Sharpe, Helms stated that Sharpe's recording and real-time broadcasting of the traffic stop from within the stopped car was an "officer safety issue." Pl.'s Ex. A at 17…. during the traffic stop, Sharpe did not have a clearly established First Amendment right to record and real-time broadcast with the ability to interact via messaging applications with those watching in real-time…. (Omitting multiple citations)

Other recent compelling cases similarly have found that there is no clearly established right to record police officers performing their official duties, therefore qualified immunity has been frequently granted to officers.[3] The few cases that have recognized some limited protection to

---

[3] E.g. *Frasier v. Evans*, 992 F.3d 1003, 1034 (10th Cir. 2021) ("we have concluded at the threshold that our determination that the officers are entitled to qualified immunity as to Mr. Frasier's First Amendment retaliation claim ."); *Turner v. Lieutenant Driver*, 848 F.3d 678, 687 (5th Cir. 2115) ("there was no clearly established First Amendment right to record the police"); *Kelly v. Borough of Carlisle*, 622 F.3d 248 (3d Cir. 2010) ("we conclude there was insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on "fair notice" that seizing a camera or arresting an individual for videotaping police during the stop would violate the First Amendment."); *Fields v. City of Philadelphia*, 862 F.3d 353 (3d Cir. 2017)

record police under appropriate and safe circumstances have not involved livestreaming from the middle of an ongoing police investigation.

### 1.    The Growing Multiple Dangers to Police Officers

There is a dangerous growing movement in America where police officers have often become the targets of *planned* and *coordinated* violence, with resulting death to officers and mayhem. Many of these schemes of coordinated violence involved the same tools that Sharpe and his amici propose here: livestream broadcasting so that Facebook comrades receive an immediate electronic invitation to the scene of a police operation.    Livestreaming from police scenes facilitates coordination of a team of anti-police supporters to arrive on scene and be ready for action.

In 1970, William Westley explained that "[t]he policeman's world is spawned of degradation, corruption and insecurity ... [H]e walks alone, like a pedestrian in Hell."  Westley, *Violence and the Police* (1970).  The

---

("[w]we cannot say that the state of the law at the time of our cases (2012 and 2013) gave fair warning so that every reasonable officer knew that, absent some sort of expressive intent, recording public police activity was constitutionally protected. Accordingly, the officers are entitled to qualified immunity."); *True Blue Auctions v. Foster*, 528 Fed. Appx. 190 (3d Cir. 2013) ("There is no clearly established, 'unfettered' constitutional right, in generalized terms, under the First, Fourth, or any other Amendment, to record police officers in the performance of their duties…)

conditions confronting police officers in 2022 include near constant physical dangers while legal risks to officers have exploded with increasing individual capacity claims, thereby crippling effective law enforcement services for citizens.

The Cato Institute supports Plaintiff and made one key observation: "Policing is dangerous, difficult work." Cato brief at 27. Officers William Ellis and Myers Helms served on the front line facing that danger and doing that difficult work; they were not afforded the luxury of think tank discourse; they made judgment calls; they were correct as there is no clearly established constitutional right to livestream from within a police investigative scene.

Violence against law enforcement officers, even including the latest electronic tools of *planned* and *coordinated* violence, has exploded in recent years.[4] The horrific damage to the police community for performing their jobs should be intolerable in America. Yet the trends

---

[4] But mob violence against police officers is hardly new. A 1914 case demonstrates the conspiracy to assault police officers. "He who hunts with the pack is responsible for the kill. An aider and abettor, or an accomplice, is as guilty as he who fired the pistols and wounded the policemen…. They conspired to take the life of the policemen, who were, at the time, acting strictly within the line of their duty, and in doing so committed a crime of grave enormity." *State v. Knotts*, 168 N.C. 173, 83 S.E.2d 972 (1914).

reveal that not only is the violence against the police escalating, but it has also risen to a war-like status. E.g., MacDonald, *The War on Cops* (2016). The events of January 6, 2021 at the United States Capitol is perhaps among the most glaring examples. E.g. *One Year Since the Jan. 6 Attack on the Capitol (justice.gov)* www.justice,gov/usao/dc-one-year-jan-6-attack-capitol. That is just one example: there have been recent anti-police riots around the country where scores of targeted police officers have been injured or killed.

Police officer duties require officers to physically encounter a broad range of suspects, subjects and others in the course of their ordinary duties. Judge Wilkinson, in a sentencing case, addressed the persistent problems of violence perpetrated against police officers:

> Decade upon decade of Maryland resisting arrest law paints a clear picture of violent force unleashed against arresting officers. Case after case recounts violent outbursts by defendants: fighting, pushing, and hitting an officer; biting an officer with sufficient force to break the skin; dragging an officer to the ground; swinging handcuffs at an officer; wielding a straight-edged razor against an officer and slashing his arm; driving a vehicle in an attempt to run an officer over; punching an officer repeatedly in the head; stabbing an officer with a ballpoint pen; tearing the badge off an officer's uniform and swinging at the officers with the badge's pin; kicking an officer in the groin; striking an officer in the stomach and chest. *See* Appendices I & II…

It is always sad to say what should never need to be said: these street encounters are not tea and crumpets.

*U.S. v. Aparico-Soria*, 740 F.3d 152, 158-59 (4th Cir. 2014) (Wilkinson, J., dissenting). Judge Wilkinson's analysis was limited to the narrow area of misdemeanor resisting arrest cases in Maryland. But there is much more.

National data demonstrates the tragedy of the mayhem and death inflicted on the American police community. See *National Law Enforcement Officer Memorial Fund*, which provides the current data demonstrating the violence against police officers. www.nleomf.org. Officers "died in a variety of situations - arrests, traffic pursuits or stops, investigations of suspicious persons or circumstances, ambushes, tactical situations, disturbance calls, and more." *The Risks to The Thin Blue Line*, October 28, 2013; www.fbi.gov/news/stories/203/October.

Courts long ago recognized that police officers are "called on to deal with violators of the law, and not infrequently to act in the presence of conditions importing serious menace..." *State v. Dunning*, 177 N.C. 559, 98 S.E.2d 530, 531 (1919). For at least 151 years, Courts have expressly recognized the need to protect "the safety of him [police officer] . . .." *State v. Bryant*, 65 N.C. 327, 1871 WL 2196 at * 2 (N.C. 1871).

The North Carolina Supreme Court has explained that "[p]olice officers have a duty to apprehend lawbreakers." *Parish v. Hill*, 350 N.C. 231, 513 S.E.2d 547, 550 (N.C. 1999). "Police must pursue crime and constrain violence, even if the undertaking itself causes violence from time to time." *Menuel v. City of Atlanta*, 25 F.3d 990, 997 (11th Cir. 1994). The officers in this case were merely doing their jobs, and they certainly did not violate any clearly established law.

The argument of Plaintiff and his six amici overlook rudimentary police operations procedures, incident scene protocols, risks and basic procedures of policing. For example, vehicular traffic stops often start with the officer requesting the citizen to place both hands visibly on the steering wheel. See *North Carolina Basic Law Enforcement Training Manual*, Techniques of Traffic Law Enforcement at 21. This is to ensure that the citizens do not have a weapon in either hand, which promotes the safety of both the citizen and the officer. Yet under Plaintiff's livestreaming rights theory, Plaintiff wants to be able to livestream with his cell phone in one hand in the name of the First Amendment. Plaintiff and his amici do not appreciate what its like to see a flash of metal and a pointed barrel in a split second. There is no court in America that has

12

constitutionally protected livestreaming from within an ongoing police investigative scene.

### 2. Vehicle Stops Pose Unique and Substantial Inherent Risks to Officers

The Supreme Court has repeatedly recognized that traffic stops pose especially significant risks of harm to police officers:

> Traffic stops are especially fraught with danger to police officers, who may minimize the risk of harm by exercising unquestioned command of the situation. …the government's 'legitimate and weighty' interest in officer safety outweighs the 'de minimis' additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle.

*Arizona v. Johnson*, 555 U.S. 323, 330 (2009); *see Rodriguez v. United States*, 575 U.S. 348, 356-57 (2015); *Maryland v. Wilson*, 519 U.S. 408, 413 (1997); *Michigan v. Long*, 463 U.S. 1032, 1047-48 (1997). For this reason, officers are allowed to "exercise command of the situation" and intrude on the occupants' personal liberties to carry out the purpose of the stop and protect officer safety. *Id.*; *see also Michigan v. Summers*, 452 U.S. 692, 702-03 (1981).

When a vehicle is stopped, law enforcement officers have legal duties to initially investigate to determine whether there appears to be probable cause that an offense has been committed. The stop location becomes the "scene" where the police investigation unfolds. Managing

13

police scenes is an integral part of the law enforcement investigative function.

Investigative scenes typically entail a trained series of steps to accomplish the investigative mission. Real police incident scenes are not stylized scenes from Hollywood movies or television sets where the dialogue has been scripted. The glint of a steel barrel might emerge in a split second. Livestreaming from an ongoing fluid scene poses innumerable risks of inciting of anti-police violence right in the middle of an evolving investigation. *Protections* for the officers on an investigative scene are crucial.

President Obama remarked about the importance of law enforcement officers and the need for "*protections*" for police officers:

> So what these officers do is dangerous. They do it because it's important. Maintaining the public safety is the foundation of everything that is good that happens every single day in America…

> And that's why Americans everywhere owe a debt to our nation's law enforcement. And we have to do our part by making sure all of you have the resources and *protections* and support that you need to do your job well. *http://www.whitehouse.gove/thepress-office/2017/05/12/ Remarks-present-and-vice-president-honoring-national-Association-pol-0. (Emphasis added)*

Attorney General Loretta Lynch described yet another round of police officer killings: "These tragic deaths make clear the great risks that

14

our brave men and women in uniform face each and every day, and the deep and abiding gratitude that our nation owes them for their service." *Statement by Attorney General Loretta E. Lynch on Recent Officer Deaths in Florida*, OJ 17-019, 2017 WL 5533. "Since the first known line-of-duty death in 1791, more than 21,000 U.S. law enforcement officers have made the ultimate sacrifice." www.nleomf.org/facts-figures.

A 2022 preliminary report by the FBI demonstrated that intentional killings of police officers are at the highest level since 1995. *See* Emma Tucker and Priya Krishnakumar, "Intentional killings of law enforcement officers reach 20-year high, FBI says," CNN (Jan. 13, 2022), https://www.cnn.com/2022/01/13/us/police-officers-line-of-duty-deaths/index.html.

The anti-police violence, the anti-police riots in America and the resulting war on police has become the subject of intense scrutiny including by the Congress. See, e.g., *Congressional Resolution*, H. Res. 1071, July 20, 2020, 116th Congress, Second Session, which provides in pertinent part:

> Whereas law enforcement officers willingly face dangerous circumstances and the threat of serious bodily injury or death on a daily basis to ensure the safety of all Americans;

Whereas the National Law Enforcement Memorial and Museum reports that as of December 31, 2019, 1,627 law enforcement officers had died in the line of duty during the past decade, a rate of one law enforcement death every 54 hours;

Whereas the National Law Enforcement Memorial and Museum's 2020 Mid-Year Law Enforcement Officers Fatalities Report detailed that 65 law enforcement officers have been killed in the line of duty this year, including 27 officers who were killed in firearms-related incidents;

Whereas peaceful protests sparked by the death of George Floyd have been hijacked by violent extremists and progressive groups seeking to sow discord, damage property, loot businesses, and inflict harm against civilians and law enforcement officers;

Whereas law enforcement officers have been run over, shot, hit with objects, and stabbed attempting to maintain peace and the rule of law during the violent protests following George Floyd's death;

Whereas the New York Post reported on June 8, 2020, that more than 700 Federal, State, and local law enforcement officers have been injured during protests resulting from George Floyd's death.

Police work requires officers to physically encounter a broad range of subjects in the course of their ordinary duties. The daily work of police officers serving in patrol and related functions puts officers on the front line and directly in harm's way, often requiring instantaneous responses to all types of unpredictable human behaviors.

Typical police encounters often pit officers against dangerous subjects at traffic stops, domestic calls, and many other routine police operations. Police encounters often become confrontational and the physical risks to officers during such encounters can quickly present deadly threats. Police officers are confronted with some of the deadliest weapons including automobiles, shotguns, rifles, pistols, knives, fireplace pokers, stun guns, tasers, straight razors, box cutters, baseball bats, batons, hammers, spears, clubs, pipes, axes, hatchets, self-made bombs, machetes, chemical sprays, flag poles, rods, and other devices capable of instantaneous death to officers. Many of these types of weapons have been hidden within vehicles at traffic stops and used against officers.

### 3. Roadside Traffic Stops Are Inherently Dangerous

This case involves a law enforcement investigation during a vehicular traffic stop. In *U.S. v. Fager*, 811 F.3d 381, 389 (10th Cir. 2016), the Tenth Circuit explained how traffic stops "historically have proven to be especially dangerous to officers." The Supreme Court also found that the especially dangerous context in issue here - traffic stops - may be "'especially fraught with danger to police officers' " and thus justify more

invasive police action than would be permitted in other settings. *Arizona v. Johnson*, 555 U.S. 323, 330 (2009).

These typical roadside investigations present numerous safety risks to officers. See e.g. Scoville, *The Hazards of Traffic Stops*, *Police Magazine* (October 19, 2010) ("Sudden attacks happen at any time and through many different means. Motorists have put their cars in reverse and hit the gas in efforts to deploy the airbags in an officer's car; other officers have been fired upon as soon as they lit up a car, approached on foot, or attempted to effect an arrest.")

Traffic stops are inherently dangerous and pose significant threats to the physical safety of officers. It is not uncommon for routine traffic stops to erupt with violence. Roadside ambushes of officers are becoming more common. The roadside environment places officers within a few feet of other moving vehicles. The stopped vehicle is typically left running unless the officer has cause to direct the engine to be shut off, therefore the stopped motorist's vehicle is an instantaneously available deadly weapon that can be used to run over the officer. Motorists who have committed, or who are still committing criminal offenses, sometimes panic and engage in various imminently threatening actions such as

vehicular flight, the retrieval of various weapons, or furtive movements inferring reaching for an apparent weapon.

Sometimes motorists are transporting contraband and have incentive to either try to escape or to simply kill the officer. An endless array of risky behaviors are frequently encountered. See Federal Bureau of Investigation. *Law Enforcement Officers Killed and Assaulted 2014*. Washington, DC; U.S. Department of Justice. www.fbi.gov/about-us/cjis/ucr/leoka/2014/officers-feloniously-killed; Brandl & Stroshine, *Toward an Understanding of the Physical Hazards of Police Work*, Police Q, 6 (2) (2003), pp. 172-191. "Although traffic stops are relatively common occurrences, they pose a unique risk in that they involve elements of uncertainty and can escalate quickly, resulting in ambushes or pursuits." Blair, Fowler, Betz & Bumgardner, *Occupational Homicides of Law Enforcement Officers, 2003–2013: Data from the National Violent Death Reporting System* 51 *American Journal of Preventive Medicine*, 188-196 (November 2016).

The Supreme Court has often reaffirmed the unique and substantial risks to officer safety in traffic stops. The Court has allowed police officers during routine traffic stops to order drivers, *Pennsylvania*

*v. Mimms*, 434 U.S. 106 (1977) and passengers from the car to ensure police officer safety. *Maryland v. Wilson*, 519 U.S. 408 (1997).  The government has a substantial, weighty, and legitimate interest in officer safety. *Wilson*, 519 U.S. at 412 (stating that the public interest in officer safety is "both legitimate and weighty"); *Rodriguez v. United States*, 575 U.S. 348, 356-57 (2015); *Johnson*, 555 U.S. at 330-32; *Wilson*, 519 U.S. at 413-14; *Michigan v. Long*, 463 U.S. 1032, 1047-48 (1983). *See U.S. v. Stanfield*, 109 F.3d 976, 979-80 (4th Cir. 1997) ("paramount interest in officer safety and the extraordinary risks to which law enforcement officials are exposed….").

"Law enforcement is a high-stress occupation that involves exposure to potentially dangerous and violent situations such as conducting criminal investigations, responding to crimes in progress, conducting patrols, apprehending criminals, managing escalating hostile encounters such as disturbance calls including domestic disturbance calls, working late at night or during early morning hours, pursuing fleeing or speeding motorists, and conducting traffic stops." Blair, et. al., *Occupational Homicides of Law Enforcement Officers, 2003–2013: Data from the National Violent Death Reporting*

*System*, 51 *American Journal of Preventive Medicine* 188 (2016) (omitting footnotes and cited data).

**B.    THE    DISTRICT    COURT    CORRECTLY DISMISSED   THE   INDIVIDUAL   CAPACITY CLAIMS   BASED   ON   QUALIFIED   IMMUNITY BECAUSE   THERE   IS   NO   CLEARLY ESTABLISHED  CONSTITUTIONAL  RIGHT  TO ENGAGE  IN  LIVESTREAMING  BROADCASTING DURING  A  POLICE  INVESTIGATION  FROM  A STOP SCENE**

If the Court reaches a constitutional interest balancing test and application, Plaintiff's livestreaming is unprotected for additional reasons.   Assuming arguendo that livestreaming is constitutionally protected, expression can be limited based upon time, place and manner regulation. E.g., *Ross v. Early*, 746 F.3d 546, 552 (4th Cir. 2014) and many cases cited therein. Police investigative scenes are surely among the most important and sensitive locations where traditional First Amendment freedoms are subject to limitations. See, e.g. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 262 (3d Cir. 2010) (holding there was no clearly established "right to videotape police officers during a traffic stop").

If this Court were to reach any constitutional interest balancing, the officer safety and public safety considerations far outweigh any

interest in livestreaming. In balancing interests, this Court should be mindful of Supreme Court precedent that law enforcement officers are not "relegated to a watered-down version of constitutional rights." *Garrity v. New Jersey*, 385 U.S 493, 500 (1967). The lives and safety of police officers should be a monumental interest. "We begin our analysis by stating the well settled rule that men and women do not surrender their freedoms when joining the police force." *Driebel v. City of Milwaukee*, 298 F.3d 622, 637 (7th Cir. 2002); accord *Hunter v. Mocksville*, 789 F.3d 389, 393 (4th Cir. 2015).

1. **The Doctrine of Qualified Immunity in Law Enforcement Disputes Includes Special Principles to Protect Officers From Death And Bodily Injury From Subjects Of Criminal Investigations**

The doctrine of qualified immunity in police conduct cases contains several core principles and special rules for application in the unique police environment. These principles distill down to the following:

1. The constitutional right in question must be clearly established at the *specific level* of the case before the court. E.g. *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019); *Wilson v. Prince George Cty*, 893 F.3d 213, 221-22 (4th Cir 2018).

2. This Court has held that to determine whether a right was clearly established at the time of the alleged violation, courts "need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999). Thus, "[i]f a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense." *Id.*

3. A reviewing court must apply the "could have believed" standard, which insulates officers from individual liability where an objective officer could have believed that his/her conduct was lawful. E.g., *Hunter v. Bryant*, 504 U.S. 224, 227 (1991). Police officers are insulated from liability by the compliance with the "reasonable belief" test. See *Turner v. City of Greenville*, 197 N.C. App. 562, 567, 677 S.E.2d 480 (2009) (justification depends upon based what the officer "reasonably believes.") The "could have reasonably believed" test has been specifically applied in cases adjudicating the filming of police. *Mocek v. City of Albuquerque*, 813 F.3d 912, 932 (10th Cir. 2015).

4. The facts and issues must be viewed from the perspective of an objective officer on that scene facing the same circumstances and risks.

*Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001) ("we view the facts from the perspective of the officer.*")*

5. Officers are insulated from individual liability for decisions based on *reasonable mistaken beliefs*. *Saucier v. Katz*, 533 U.S. 194 (2001).

6. Under the law enforcement presumption, "an officer is presumed to be acting lawfully while in the performance of his official duties." *State v. Anderson*, 40 N.C. App. 318, 254 S.E.2d 48, 52 (1979).

In order for Plaintiffs to overcome qualified immunity, they must prove that the *specific constitutional right in issue* has been "clearly established." In *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019), the Supreme Court explained the *rule of specificity*:

> Under our cases, the clearly established right must be defined with specificity…. precedent squarely governs the specific facts at issue…. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. *Id*., at ——, 138 S. Ct., at 1153 (quotation altered).

In *Wilson v. Prince George's Cty., Maryland*, 893 F.3d 213, 221–22 (4th Cir. 2018), this Court explained the specificity requirement and the "authoritatively decided" requirement:

> To determine whether a right is clearly established, we assess whether the law has "been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state.

This Court further explained:

> [T]he Supreme Court has emphasized in recent years that courts are "not to define clearly established law at a high level of generality," and that "[s]pecificity is especially important in the Fourth Amendment context." *Kisela v. Hughes*, —— U.S. ——, 138 S. Ct. 1148, 1152, 200 L. Ed. 2d 449 (2018)

An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014).

Unless a police officer's "act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the [officer] has immunity from suit." *Lassiter v. Alabama A&M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994). If reasonable public officials could disagree about the lawfulness of the officer's actions, the officer is entitled to qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

For a right to be clearly established, it "must be sufficiently clear that every reasonable officer would [have understood] that what he is

doing violated that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). The "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 131 S. Ct. at 2083.

In *White v. Pauly*, 137 S. Ct. 548, 552 (2017), the Court reversed a denial of qualified immunity and reasoned that the lower court "failed to identify a case where an officer acting under similar circumstances as Officer White was held to had violated the Fourth Amendment." Similarly, in *District of Columbia v. Wesby*, 138 S. Ct. 577, 591 (2018), the Court reversed the denial of qualified immunity where the Circuit Court had not identified a single on point precedent.

*Wesby*'s reasoning is spot on here: "The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the *particular circumstances* before him." (Emphasis added). There is no such case in this Circuit or anywhere else holding that citizens enjoy a clearly established constitutional right to livestream from and during a criminal investigation. The right to record by bystanders is not even clearly established.

In order to determine whether a right was clearly established, courts "need not look beyond the decisions of the Supreme Court, this

court of appeals, and the highest court of the state in which the case arose." *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999). Thus, "[i]f a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense." *Id.* Here, since Plaintiff has failed to cite an on-point case within this Circuit, the officers retain their qualified immunity.

> **2.** **Law Enforcement Determinations Require an Objective Reasonableness Standard and The Could Have Believed Standard Because Officers Are Entitled to Qualified Immunity If They Reasonably Could Have Believed That Their Conduct Was Appropriate**

In *Park v. Shiflet*, 250 F.3d 843, 853 (4th Cir. 2001), this Court explained the "could have believed" test:

> "A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information could have believed that his conduct was lawful." *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)); *see also McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994) (stating that regardless of whether probable cause actually exited, officer is entitled to qualified immunity if the officer "*could* have ... believed that his conduct was lawful")

Here, the officers could have reasonably believed that their action terminating only the livestreaming but not the recording was entirely appropriate.

The "first step is for the Court to determine whether the "[d]efendant['s] actions were objectively reasonable." *Marvin v. City of Taylor*, 509 F.3d 234, 245 (6th Cir. 2007), citing *Scott v. Harris*, 550 U.S. 372, 380 (2007). "To gauge objective reasonableness, a court examines only the actions at issue and measures them against what a reasonable police officer would do under the circumstances." *Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994).

## V.  LIMITED RESPONSE TO PLAINTIFF'S SIX AMICI: POLICE REFORM EFFORTS MUST GENERALLY BE ADDRESSED TO LEGISLATIVE BODIES OR THE SUPREME COURT

Plaintiff's six amici are the Electronic Frontier Foundation, the Institute for Justice, the Cato Institute, the American Civil Liberties Union, the Electronic Privacy Information Center, and the National Police Accountability Project. They offer 208 pages of briefing with overly generalized First Amendment theory, but which is simply not at all  on point for the specific livestreaming issue before this Court. The *rule of specificity* in qualified immunity analysis must be applied.

These amici appear to be waging a coordinated campaign across the country seeking to fundamentally change the core principles of policing. They are in the wrong forum here for their draconian proposed changes to policing. Some of these amici have appeared in some other similar litigation asserting their position that there is a virtually unfettered right to record police operations. See *Frasier v. Evans*, 992 F.3d 1003 (10th Cir. 2021), which reaffirmed that there is no clearly established law supporting the recording of police, even generally.

There is a national "police reform" movement, apparently spearheaded in part by at least some of Plaintiff's amici seeking to eradicate qualified immunity for police officers. This Court is the wrong forum for such efforts. There have been diligent legislative reform efforts before Congress to that effect – which have failed. There have also been diligent but failed efforts in various litigation before the Supreme Court to attempt to overrule or substantially modify the doctrine of qualified immunity. Our Supreme Court has recently denied countless certiorari petitions seeking modification to the doctrine of qualified immunity. Plaintiff's amici have assailed the historic doctrine of qualified immunity. See, e.g., Amicus Brief of Cato Institute in *Frasier v. Evans* in support of

Petitioner's Petition for a writ of certiorari before the Supreme Court. (Filed August 16, 2021; the petition appears on the Cato Institute website).

*Frasier* is among the most recent efforts by many of Plaintiff's amici seeking to establish a constitutional right to record the police. The Tenth Circuit flatly rejected Amicis' efforts to change the law, as the Tenth Circuit held that the officers there were entitled to qualified immunity because there is no clearly established right to record the police. 992 F.3d at 1003, 1019 (10th Cir. 2021). Plaintiff agreed (Appellant's brief at 38) but offered no argument as to why *Frasier* and numerous other cases are not persuasive precedent for this Court. *Frasier* is highly analytical and persuasive.

Our Supreme Court's recent cases have soundly and repeatedly reaffirmed the traditional principles of qualified immunity – especially in cases against law enforcement officers. Despite these settled principles, Plaintiff's amici essentially ask this intermediate appellate court to undo this controlling Supreme Court precedent. Stare decisis and the rule of law require that we all respect Supreme Court precedent.

When one views the amicus brief in *Frasier*, as compared with what Amici assert before this Court, one sees the same rehashed argument that the Tenth Circuit repudiated in *Frasier*. But *Frasier* was not cited or addressed by Cato in its amicus brief before this Court; nor did the Police Accountability Project; nor did the ACLU. But finally, the Institute for Justice pays lip service to *Frasier* but declines to state the full holding or the significance of the recent judicial rejection of Amici's positions.

Amici cite reams of newspaper articles – but no on point law supporting their position. "To be clearly established, a legal principle must have a sufficiently clear foundation in then *existing precedent.*" *Wesby*, 138 S. Ct. at 589. (Emphasis added). In their seven briefs, Plaintiff and his amici offer absolutely no existing precedent on point to avoid qualified immunity.

The proposed qualified immunity reform positions advanced by Amici have been rejected by Congress, rejected by the Supreme Court, and must be rejected by this Court.

## VI.  CONCLUSION

The settled *rule of specificity* in qualified immunity law requires that this case be decided not on the basis of bystander recording principles, or on abstract or general First Amendment principles – but on the specific context before this Court: livestreaming from and within an ongoing police investigative scene, which is most certainly not a clearly established constitutional right.

The PBA respectfully prays that this Court issue an order affirming the District Court's qualified immunity determination and dismissal.

/s/ J. Michael McGuinness
*J. Michael McGuinness*
*The McGuinness Law Firm*
P. O. Box 952
2034 Highway 701 North
Elizabethtown, N.C.  28337
910-862-7087 Telephone
888-862-2505 Facsimile
jmichael@mcguinnesslaw.com
Counsel for Amicus Curiae PBA

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

   [ X ] this brief contains [*6,371*] words.

   [  ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.     This brief complies with the typeface and type style requirements because:

   [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Century Schoolbook*]; *or*

   [  ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>January 25, 2022</u>        <u>/s/ J. Michael McGuinness</u>
                                      *Counsel for Amicus Curiae*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 25th day of January 2022, I caused this *Amicus Curiae* Brief of the Southern States Police Benevolent Association in Support of Appellees Seeking Affirmance to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all counsel of record as registered CM/ECF users.

/s/ J. Michael McGuinness
*Counsel for Amicus Curiae*